MARY KENNEDY v. W. D. KELLY.[1]

October 31, 1913.

Nos. 18,145—(45).

**Will — testamentary capacity — evidence.**
>The decision of the trial court that the testatrix did not possess testamentary capacity at the time the proposed will was executed is sustained by the evidence.

After the former appeal reported in 119 Minn. 531, 137 N. W. 456, the appeal from the order of the probate court allowing the will of Catherine Myler, deceased, was tried in the district court for Ramsey county before Brill, J., who made findings and ordered judgment reversing the order of the probate court. From an order denying William D. Kelly's motion for an order to amend the findings of fact and conclusions of law and for a new trial, he appealed. Affirmed.

*Thomas C. Daggett,* for appellant.
*W. B. Douglas* and *Kennedy & Kennedy,* for respondent.

TAYLOR, C.
When this case was previously before this court, the decision of the trial court allowing and establishing the proposed will was reversed and a new trial directed for the reason that the validity of the will was involved in so much doubt that the court deemed "that the interests of justice will be best served by another trial." Kennedy v. Kelly, 119 Minn. 531, 137 N. W. 456.

At the second trial the evidence is conceded to have been substantially the same as upon the first trial and the court found therefrom that the decedent was not competent to make a will at the time this

[1] Reported in 143 N. W. 726.

---

Note.—The authorities on the question what constitutes testamentary capacity or incapacity, are reviewed in an extensive note in 27 L.R.A. (N.S.) 2.

instrument was executed and disallowed it upon that ground. Whether this conclusion is sustained by the evidence is the only question for decision.

The decedent, Catherine Myler, a widow 78 years of age, had a hemorrhage in the brain which caused paralysis of her right side and resulted in her death on March 22, 1911. The paralysis came on gradually and the time when the hemorrhage commenced is uncertain. It is undisputed, however, that the hemorrhage had begun before the making of the will in controversy, which was executed about two o'clock on Saturday, March 18, 1911.

For many years the decedent and her husband, James Myler, conducted a boarding house in the city of St. Paul. They had no children. They took contestant into their home in 1879, when she was six years of age, and in 1884 legally adopted her. She lived with them as their child until her marriage in 1906, except one year when she was in a convent. Mr. Myler died in 1897. His property passed to Mrs. Myler and she continued the business until 1907. Shortly after her husband's death, Mrs. Myler took Katie Quirk, a niece then about 11 years of age, into her home and Katie lived with her continuously thereafter. Contestant and Katie both assisted in the work about the boarding house; and Johanna Grace, another niece, also worked there for many years and until her marriage. Mrs. Myler apparently entertained a very kindly feeling toward all three and had expressed an intention at different times to provide for each of them.

The proposed will contains no mention of Johanna Grace. It contains a provision giving contestant $25; which was inserted therein on the suggestion of the attorney who drew it that she ought to be mentioned. It gives all the property save this $25 to Katie Quirk.

Under our statutes the burden is upon the proponent of a will to establish affirmatively both that the will was properly executed and that the testator was competent to execute it. In re Layman's Will, 40 Minn. 371, 42 N. W. 286.

The testimony bearing upon the mental condition of the decedent is too voluminous to quote and we will merely indicate briefly the purport of portions of it:

Mathilda Werden, one of the subscribing witnesses, had known her about three years and was the nurse who took care of her from Saturday noon until her death on the following Wednesday. Was not present while the will was being drawn but was called in by Dr. Kelly to sign as a witness and did so. Attempted to rouse her a few minutes before the will was drawn and failed to do so. She did not speak to witness nor show in any way that she recognized witness or that she was conscious during any of the time that witness attended her. In witness' opinion she was not capable of comprehending the will.

Mary Dore, wife of Maurice Dore a nephew of decedent, saw her immediately after the making of the will and held her while the bed which she had soiled was being changed. She gave no assistance and never spoke or opened her eyes. Never recognized anyone before witness left at midnight.

Magdelena Klecatsky, a neighbor who had known her for 14 years, saw her Saturday evening, took her by the hand and spoke to her, but no reply or sign of recognition.

Maurice J. Dore, a nephew, took her hand and shook it and spoke to her several times Friday evening, but no reply or recognition. Saw her again Saturday both before and after the will was made and she did not speak or recognize anyone and never did thereafter.

Mary Mullaney, her sister, was with her on Saturday both before and after the execution of the will and repeatedly took her by the hand and spoke to her, but she did not speak or move or give any sign of recognition or that she knew what was going on about her.

Mary Kennedy, the contestant, washed her and dressed her hair Saturday forenoon. She gave no assistance and no signs of recognition, and apparently was helpless and in a stupor.

Mary Molloy saw her Monday evening and she was unconscious.

Johanna Grace, the niece who had worked for her for many years, saw her on Wednesday. She could not talk plain and complained of her head all the time. Saw her again on Friday afternoon and took her hand and spoke to her repeatedly, but no motion or sign of recognition. Saw her again on Saturday evening and tried to arouse her

but without effect. She lay in a stupor and so remained until her death.

John Grace, husband of Johanna Grace, took her hand and spoke to her on Thursday. She looked at him but made no answer.

Jane Brown: Saw her on Sunday preceding the making of the will. She was quite sick and said the trouble was all in her head and that she was dizzy when she stood up. Saw her on the following Tuesday. She said her head was getting worse and that she had never felt like that before and seemed to choke when she tried to talk. Saw her on Friday evening. She seemed in a doze and remained in that condition, although those present talked in a loud tone of voice. Saw her on Saturday forenoon. She was in a stupor. Kissed her and she opened her eyes but only a rattle in her throat when she tried to speak. Saw her on Monday. She was unconscious and helpless and so remained thereafter.

Andrew J. Myler, a nephew of her deceased husband: Saw her on Friday afternoon. Different ones spoke to her and once she partly opened her eyes but immediately closed them again; gurgled in her throat but did not speak.

Daniel C. Kennedy, husband of contestant: Saw her the Sunday before the will was made. She did not talk much. Said sickness all in her head. Saw her again Thursday and she did not recognize him nor speak. Saw her again Friday forenoon. His children were presented to her, but she did not recognize them nor reply to questions. Saw her again Friday evening. Lifted her up and moved her in bed. She did not speak and was apparently unconscious. Saw her again Saturday evening and moved her as on Friday and she was apparently in the same condition.

Dr. Charles R. Ball testified as an expert that in his opinion she was not of sound mind when the will was executed.

Thomas C. Daggett drew the will and was a subscribing witness thereto. Had never seen her before. Was in her presence about half an hour. She recognized those present, expressed herself without difficulty, and comprehended the transaction.

Katie Quirk, the beneficiary under the will: Was not present when the will was drawn, but was called in when it was signed. Mr.

Daggett put the pen in her hand, placed his hand over hers, and she made a cross. She spoke and no difficulty in understanding her. Witness had stated on Thursday that her aunt's mind wandered and that she seemed not to recognize Dan Kennedy at first but afterwards spoke to him.

Josephine Friberg: Saw her on Wednesday. She was up and had no difficulty in talking. Saw her on Friday morning. She was in bed and told the priest who was present that she was ready to die. There was no difficulty in understanding her. Saw her on Saturday morning. In answer to a question by Katie she said she felt pretty bad. Drank some tea and took her medicine. Lifted her up to arrange the bed and felt her helping to move herself. Was about the same as on Wednesday. Mrs. Kennedy asked how she felt and she said very bad. Was apparently asleep when witness left.

Ann Smith: Saw her Friday evening and was told by her to shut the door and sit down where it was warm. Did not see her move or hear her speak afterwards. Was there about an hour.

Elizabeth Waters, a nurse who had attended her during a previous illness: Saw her Friday evening. Conversed with her concerning her condition and why witness could not attend her. She talked intelligently and without difficulty.

Mary Quirk, sister of the beneficiary: Saw her Wednesday night. She had no difficulty in speaking. Saw her again Thursday afternoon and evening. She spoke intelligently and without difficulty and took a drink of milk, using both hands. Saw her Friday morning, Friday afternoon, Friday evening, and also in the night toward morning. She spoke intelligently. Saw her again Saturday evening and remained until late. Several present but no conversation with her by anyone that evening. After 11 o'clock, Katie, who usually slept with her, kissed her and she said "get in here." Never heard her speak afterward.

William Quirk, a brother of the beneficiary: Saw her Wednesday, Friday, and Saturday forenoon and she spoke intelligently each time. Saw her again Monday evening and Tuesday evening and she did not speak.

Dr. William D. Kelly, the attending physician and the executor named in the will: Had been her physician for 20 years. Was present when the will was drawn. At that time she had a beginning paralysis of face and tongue and some difficulty in speaking, but her mind was clear. At all previous times could talk without difficulty. Paralysis resulted from hemorrhage in the brain. She recognized him until Tuesday.

It also appears without dispute that she soiled the bed at different times on and after Friday and never indicated in any way that she knew what had occurred.

We have examined the evidence with care and find it ample to sustain the decision of the trial court and the order appealed from is affirmed.

HALLAM, J., took no part.