IN RE ESTATE OF MILE CALICH.
MANE CALICH v. CONSUL OF THE KINGDOM OF
JUGO-SLAVIA AND OTHERS.[1]

February 11, 1943.

No. 33,329.

[1]Reported in 8 N. W. (2d) 337.

*John M. Gannon, Everett P. Freeman,* and *H. Van Valkenburg,* for appellant.

*Thomas H. Strizich,* for respondents.

YOUNGDAHL, JUSTICE.

This action was commenced by Mane Calich, appellant, on April 22, 1940, in the probate court of St. Louis county, by filing a petition for the allowance of a certain document, claimed by appellant to be a copy of the last will and testament of Mile Calich, deceased. Appellant contends that the original will was lost. The petition to prove the alleged lost will was denied by the probate court. On appeal to the district court, the action was tried *de novo* to the court, which also found that no will had been executed. Findings of fact, conclusions of law, and order for judgment were filed affirming the order of the probate court. The judgment entered pursuant thereto is now before us for review.

It is undisputed that on April 16, 1938, Mile Calich, 58 years of age and a miner of Yugoslavian birth, was found dead from a self-inflicted gunshot wound in his cabin north of the village of Buhl, St. Louis county, in a district known as Wanless Location. He came to the United States in 1907 and found employment in various mines on the Mesaba Iron Range. By living frugally, he accumulated a substantial sum of money. He died possessed of a savings account with the First National Bank of Chisholm in the sum of $14,489.42, and one in the Buhl State Bank with a balance of $151.12. Other personal property included a cow, which sold for $30, and the cabin, where decedent lived alone, which sold for $20. He had no real estate. The land upon which the cabin was built was leased from a local mining company. On April 22, 1939, appellant petitioned the probate court of St. Louis county for letters of administration in the estate of Mile Calich, deceased, and prayed for the appointment of Michael Baich as administrator. In

this petition appellant alleged that he was a second cousin of deceased and the only heir at law residing in the United States. Further in the body of the petition, in the space provided for listing the names of all heirs at law of decedent, appellant designated himself as the sole heir of the deceased. Moreover, in this petition appellant claimed that the deceased died without leaving a will. After a hearing on the petition, letters testamentary were granted appointing Michael Baich as administrator. He duly qualified and has continued to act in that capacity. One year later, on April 22, 1940, appellant filed another petition in the probate court of St. Louis county. This petition sought the allowance and probate of the purported lost will of Mile Calich, deceased, in which appellant was named as sole beneficiary, and for the appointment of Michael Baich as executor. It is the position of respondents that the will in question was never executed.

Appellant testified that he and deceased were born in the same section of Yugoslavia and that their paternal grandfathers were brothers. He came to the United States in 1906, one year before deceased arrived. From 1920 until 1929 he saw deceased "very often" and visited him "lots of times"—about "ten times a month." During the five years preceding deceased's death, appellant states that he saw him "about six times." The circumstances surrounding the execution of the purported will, as claimed by appellant, are substantially these: Bozidar Yankovich, one of the subscribing witnesses to the will, states that in April 1938 he had occasion to call on the next-door neighbor of deceased. Not finding him at home, he stopped in the yard of Mile Calich, deceased, and inquired where the neighbor might be. This was the second time witness Yankovich had seen deceased. He first met him in 1937 at a Serbian picnic in Hibbing. While in the yard, Mile Calich requested Yankovich to tell appellant that he, Mile Calich, wanted to make a will; that he wanted appellant to come to see him and bring Yankovich and another man along, apparently to serve as witnesses. This message was subsequently reported to appellant, and on August 6, 1938, in company with one Rade Ralich, he drove

to Hibbing. There they met witness Yankovich, and the three proceeded to the shack of Mile Calich. Some discussion then took place in which deceased said he wanted to make a will and leave all his property to appellant. Appellant and witness Yankovich then inquired of deceased as to relatives he might have in Yugoslavia. Deceased said he had "some relations, sister and some family trees left." Thereupon, the will was drawn. While witness Yankovich read a form of will from "The Business Guide or Safe Methods of Doing Business" (revised edition of 1912), which appellant had brought along for the occasion, and spelled many words out letter by letter, appellant wrote the will in longhand. Thus completed, appellant signed the name of deceased, who then added his mark. The subscribing witnesses, Yankovich and Ralich, executed the will in the presence of deceased and of each other. The statutory requirements were met insofar as the formalities of execution of a will were concerned. Appellant placed the will in his pocket and returned to Minneapolis. In his one-room apartment, appellant kept the will in a dresser drawer, together with decedent's savings account passbook in the First National Bank of Chisholm. Appellant contends that this bankbook was given to him for safekeeping by deceased in 1912. On April 17, 1939, appellant received a telegram from an undertaker at Chisholm advising him that Mile Calich was dead. He took the will and bankbook from the dresser and thought he had put both instruments in his satchel. He attended the funeral of deceased on April 20. The next day, prior to going to his lawyer's office, he discovered that he had neither the will nor the bankbook with him. On April 21, 1939, he went to his attorney, Mr. Freeman of Chisholm, and signed a petition for the probate of the estate of Mile Calich, deceased, without a will. He did not inform Mr. Freeman that a will had been executed. Upon his return to Minneapolis, he made a three- or four-day search for the lost will and bankbook but was unsuccessful in finding either. About six weeks later he found the bankbook under a radiator in his room and delivered it to the administrator. The will has never been found. Appellant did not

confide the knowledge of his loss to anyone until August or September 1939. He then told witness Ralich of the missing will. Shortly thereafter Ralich discussed the matter with a Minneapolis attorney who was in his (Ralich's) saloon for lunch. Advised that a lost will might be proved, Ralich informed appellant of his conversation, and appellant then called on the attorney. In October 1939 appellant told Mr. Freeman, his attorney, about the lost will, and on January 9, 1940, a petition was prepared and signed by appellant for the purpose of asserting his rights thereunder. This petition to prove a purported lost will was filed April 22, 1940.

Appellant's assignments of error are based upon the trial court's fourth and fifth findings of fact and the conclusions of law which, in substance, denied that the will had, in fact, been executed and denied the petition to allow the same as the last will and testament of Mile Calich, deceased.

■ Since this is an appeal from a judgment after trial by the court, no motion for a new trial having been made and no errors on rulings or proceedings at the trial being involved, the questions for review are limited to a consideration of whether the evidence sustains the findings of fact and whether such findings sustain the conclusions of law and judgment. Potvin v. Potvin, 177 Minn. 53, 224 N. W. 461; Taylor v. Northern States Power Co. 196 Minn. 22, 264 N. W. 139. Thus, the sole question here is whether or not there is reasonable support in the evidence for the court's finding that deceased did not execute a will.

■ Appellant takes the position that the trial court was bound to accept the undisputed testimony of appellant and the two subscribing witnesses to the will, and that such testimony was not sufficiently impeached to justify the findings. Respondents, on the other hand, contend that the testimony of these witnesses was so thoroughly impeached and discredited that the court was justified in disregarding it and finding that deceased had not executed a will. The rule as to uncontradicted testimony is aptly stated in 20 Am. Jur., Evidence, pp. 1030, 1031, § 1180, in this language:

"Justice does not require a court or jury to accept as absolute

verity any statement of a witness not contradicted by direct testimony. Undoubtedly, as a general rule, such testimony should be accepted as controlling, but that rule admits of many exceptions; there are many things which may properly be considered in determining the weight that should be given direct testimony of a witness although no adverse verbal testimony is adduced. If such testimony is evasive, equivocal, confused, or otherwise uncertain, it may be disregarded. If it is improbable, physically impossible, contrary to physical facts or to laws of nature or scientific principles, or is opposed to common knowledge, inconsistent with other circumstances established in evidence, or contradictory within itself, it is without value and may be disregarded."

In the case of In re Estate of Kelly, 177 Minn. 311, 315, 225 N. W. 156, 157, 67 A. L. R. 1268, this court said:

"Where the trial court makes its findings and conclusions, based on extrinsic facts in addition to the will, there is apparently no reason why its findings and conclusions should not have the same weight as in any other case. In re Paulson's Will, 127 Wis. 612, 107 N. W. 484, 5 L.R.A.(N.S.) 804, 7 Ann. Cas. 652. We are called upon here to review such findings and conclusions. Such findings are not to be set aside if reasonably sustained by a consideration of all the evidence. *This rule applies to inferences and conclusions from undisputed facts, as well as to findings on conflicting evidence. Such inferences and conclusions are treated as findings of fact and not to be disturbed unless contrary to the inferences a reasonable mind might properly draw from the evidence.* N. W. F. & M. Ins. Co. v. Connecticut F. Ins. Co. 105 Minn. 483, 117 N. W. 825; G. N. Ry. Co. v. City of Minneapolis, 142 Minn. 308, 172 N. W. 135. Under these rules we cannot say that the evidence is insufficient to sustain the findings and conclusions of the trial court." (Italics supplied.)

See also Olsson v. Midland Ins. Co. 138 Minn. 424, 165 N. W. 474; Osbon v. Hartfiel, 201 Minn. 347, 276 N. W. 270, one of the last of a long line of cases so holding.

A question similar to that presented in the instant case arose in In re Estate of Tjarks, 55 S. D. 636, 642, 227 N. W. 84, 86. In that case appellant endeavored to establish a purported lost will. Respondent claimed no will had been executed. As here, appellant urged that the trial court was without power arbitrarily to disregard the testimony of the witnesses. In sustaining the finding of the trial court denying the will, the court stated:

"We cannot say that inferences, necessarily adverse to the credibility of appellants' witnesses, are the only inferences which may be drawn from the above and similar evidence. But, on the other hand, we may not properly substitute our opinion of the credibility of the witnesses or of their statements for that of the trial court, and insist upon other permissible inferences from the same evidence."

Here the only witness who can directly dispute the facts relating to the execution of a claimed lost will is decedent. Where the only person who can directly dispute a witness is dead, the testimony of that witness should be carefully scrutinized, its reasonable probability should be considered, and for this purpose attention should be given to the circumstances surrounding any transaction which the witness may narrate and his testimony compared with all the inferences derivable from the established facts. In re Bailey (Sur. Ct.) 98 N. Y. S. 725, affirmed, 111 App. Div. 909, 98 N. Y. S. 729. In re Estate of Tjarks, *supra*. To adopt appellant's theory that the court was bound to accept as conclusive the testimony of appellant and his witnesses would be, in effect, to hold that their testimony was unimpeachable and that none of the surrounding circumstances or other proved facts tended to discredit it. Such is not the state of the record. We find many permissible deductions by way of inference which may be drawn from the evidence to discredit and impeach their testimony. We shall not attempt to point out all of the paradoxical and conflicting situations disclosed by the record. A consideration of some will suffice to indicate that there was ample support

for the findings of the trial court. On April 21, 1939, appellant signed a petition for administration in which he swore that there was no will. In the hearing on this petition he testified that there was no will. The purported lost will was not mentioned to Mr. Freeman, his attorney, when the petition was prepared. Nine days after the death of Mile Calich, appellant wrote a letter to his brother in Yugoslavia, a portion of which is as follows:

"It fell upon me because I am his nearest relative here in America to prosecute through court and get all I can from his estate *for his nearest relatives.*"   (Italics supplied.)

He also wrote to his brother as follows:

"American law here in the circumstances of this kind says that any parents of deceased have a right to his estate. If parents are not living then sisters have that right. If sisters are not living, then sisters' children get that same right. I think it is now very clear to you as to who should and who is required to sign power of attorney."

This language is clearly inconsistent with the claim that decedent executed a will making appellant the sole beneficiary. Moreover, appellant did not seek any legal advice as to his rights under the lost will until three or four months after he filed the petition for administration. In fact, a year elapsed between the filing of the petition for administration and the filing of the petition to prove the purported lost will. Appellant attempts to brush aside the signing of the petition for administration by contending that he thought it was but a preliminary step in the probate of the estate and that he did not need the will which he expected to find later. He cannot so lightly disregard his sworn statement that there was no will. Obviously, he knew the formal requisites for the execution of a will, and it is reasonable to assume that he knew what he was doing when he signed the petition for administration stating that there was no will. It is fair, also, to assume that he knew the significance of the letter he wrote to his brother in Yugoslavia. At that time it is apparent that he had obtained in-

formation as to the legal effect of the administration of an estate under the intestacy statute rather than under the statute for proving a will.

In his brief appellant characterizes his witnesses thus:

"We are dealing with witnesses of foreign extraction and with little formal education, persons not familiar with our legal rules, and suspicious and secretive by nature."

We cannot agree that appellant's witnesses were unschooled in the affairs of life. Both appellant and his two subscribing witnesses had been engaged in the beer or liquor business for a number of years. One witness had been twice convicted of selling liquor without a license. We concede that ordinary inconsistencies in the testimony of witnesses, such as the failure to remember the number of rooms in the cabin, or others having to do with the natural frailty of memory, might not be sufficient to impeach the testimony of the witnesses who testified regarding the execution of the will. Aside from these minor discrepancies, however, there are sufficient facts and circumstances of a substantial character tending directly to impeach the positive testimony of these witnesses. We do not have here the case of ignorant, illiterate witnesses unacquainted with ordinary business practices. Appellant was sufficiently cognizant of the formal requisites of a will to be able to produce before the court a copy of a will executed in strict compliance with the provisions of the statute. It is true he used a form book, but the book did not disclose whether the statutes of Minnesota required two or three witnesses to the will. He procured that information elsewhere.

Appellant claims that decedent executed the purported will by making his mark rather than by signing his name. We do not question the legality of this form of execution, but rather we consider its significance, as it impeaches the position of appellant. He claims that deceased said he could not write when he executed the will by placing his mark thereon. The undisputed testimony is that he could write his name, although he did so with difficulty.

He had previously signed payroll sheets and salary warrants. There appears no logical explanation why decedent would say he could not sign his name to such an important document as his last will and testament.

The evidence in this case does not indicate any reason why decedent should prefer appellant over his closer relatives in the old country. It is true that appellant contends he had visited deceased a number of times and that deceased imposed a high degree of confidence in him by placing his bankbook with him for safekeeping. This claim, however, was subject to the close scrutiny of the trial court. Nothing appears in the record showing devoted service during illness, nor such a close attachment as to make reasonable or explainable this preference of the second cousin as against the deceased's sister and the children of a deceased sister.

Appellant did not deem it sufficiently important to protect the $15,000 estate, to which he claims he was sole heir, to consult a lawyer regarding his rights. He did nothing until witness Ralich informed him three months later that he (Ralich) had discussed the matter with an attorney in his (Ralich's) saloon, and was advised that a lost will could be established. It is significant that this entire proceeding to establish the lost will had its inception in Ralich's saloon. We think it unusual that witness Ralich would discuss the matter with an attorney who was a stranger to the proceeding before seeking appellant's permission. All these circumstances, together with other facts disclosed by the evidence, were sufficient to impeach the testimony of appellant and his witnesses to the purported will. In addition to the inferences which may be drawn from the undisputed facts, there is the testimony of respondents' witness Marcetich. Marcetich testified that the following conversation took place with appellant on July 5, 1940:

"I asked him if he [deceased] left any relatives as heirs in this country or anywhere else, and Mane said that Mile has two real sisters in Yugoslavia married, one have six children and other have four. I asked him if they are living now. He said yes they are living in Yugoslavia. I asked him when Mile died did he have

any will or any kind of paper, such as will or testament, that he left his property to anyone. He said no, no will of any kind or any paper or letter, he left all his estate to his sisters. I asked him if he is any relation to Mile Calich. He said, 'I am his second cousin.' I asked him did he claim any estate, any money from this estate. He said, 'No, I got nothing coming. They send me telegram when he died and I went up there to funeral. I spent about forty or fifty dollars. I be satisfied if they pay me this expense.' Again I asked him if he sure [sic] that any kind of paper that was written that Mile named anybody that he wanted to give his money to, and he said, 'No, no, no will of any kind or any paper that he left except bankbook that he had and they took that from him when he died.' I do not know who he meant by they."

This conversation is denied by appellant, but on appeal we must consider it in the light most favorable to respondents. Appellant was put on notice by the inquiries made by Marcetich that the consular office was investigating the matter, and the statements made by appellant tended directly to impeach his position that there was a will.

The findings of the trial court will not be set aside if reasonably sustained by a consideration of all the evidence. A few citations will suffice for this oft-repeated rule. Church of St. Vincent De Paul v. Brannan, 97 Minn. 349, 107 N. W. 141; Coates v. Semper, 82 Minn. 460, 85 N. W. 217; Ruff v. Manhattan Oil Co. 180 Minn. 528, 231 N. W. 200; Gensler v. Feinberg, 181 Minn. 436, 232 N. W. 789. This applies to inferences from undisputed facts as well as to findings on conflicting testimony. See In re Estate of Christ, 166 Minn. 374, 208 N. W. 22; Church of St. Vincent De Paul v. Brannan, 97 Minn. 349, 107 N. W. 141; Scannell v. Hendrickson, 119 Minn. 529, 137 N. W. 1.

■ If this court were to sustain appellant's position as to the existence of the purported lost will, it would necessitate giving legal effect to a will drawn by a layman engaged unlawfully in

the practice of law. Although we hold, adversely to appellant, that there is ample support in the evidence for the trial court's findings that no will was executed, yet in view of the fact that appellant's claim is predicated upon the unlawful practice of law by a layman, we feel it our duty to comment upon this phase of the case. The dangers and pitfalls created when laymen encroach upon the legal profession by attempting to draw legal documents are too obvious to require extended discussion. Minn. St. 1941, § 481.02 (Mason St. 1940 Supp. § 5687-1), makes it unlawful, except in certain exceptional cases, for any person, except members of the bar, to prepare legal documents or to engage in advising or counseling in law or to act as an attorney or counselor at law. This court in previous cases has clearly indicated its attitude with respect to the invasion of the legal profession by laymen who endeavor to prepare legal documents or otherwise engage in the practice of law. Fitchette v. Taylor, 191 Minn. 582, 254 N. W. 910, 94 A. L. R. 356; In re Disbarment of Otterness, 181 Minn. 254, 232 N. W. 318, 73 A. L. R. 1319; Trovatten v. Minea, 213 Minn. 544, 7 N. W. (2d) 390. The unauthorized practice of law by laymen is so inimical to public welfare and results in such serious losses to those who engage such service that we feel it again necessary to vigorously condemn this practice and urge the prompt and aggressive prosecution of violations of this provision of the statute.

■ The burden of proof in this case was upon the appellant to establish the lost will. Matter of Will of Layman, 40 Minn. 371, 42 N. W. 286; Tobin v. Haack, 79 Minn. 101, 81 N. W. 758; Kennedy v. Kelly, 123 Minn. 259, 143 N. W. 726. Minn. St. 1941, § 525.261 (Mason St. 1940 Supp. § 8992-62), which refers to the quantum of proof necessary to prove a lost will, provides:

"No such will shall be established unless it is proved to have remained unrevoked nor unless its provisions are clearly and distinctly proved."

We hold that there is ample support in the evidence for the trial

court's finding that this burden of establishing the existence of the purported lost will was not sustained.

The issue as to whether or not a will was executed was tried carefully and thoroughly before two judges, a probate judge and a district judge, both men of long experience. They had the benefit of the so-called "trial atmosphere," which gave them the opportunity to observe the demeanor of the witnesses upon the stand, and, because of this, they were in a much better position to pass upon the credibility of the witnesses than we are, with only the cold record before us.

After a careful consideration of the record and viewing the testimony as a whole, we find ample evidence in the record impeaching the testimony of appellant and his two subscribing witnesses to such an extent that the trial court was clearly justified in finding that the will in question was never executed. Having so found, all the discussion relating to its revocation becomes immaterial. Obviously, there can be no revocation of a will which never existed.

Judgment affirmed.

