252 Minn. 46 (1958)
89 N.W. (2d) 19
IN RE ESTATE OF JOHN F. SANDSTROM, ALSO KNOWN AS J.F. SANDSTROM.
WILLARD R. SANDSTROM
v.
D.W. WAHLSTROM.
No. 37,292.
Supreme Court of Minnesota.
March 21, 1958.
*48 Louis Sachs, Richard F. Sachs, and Sachs, Karlins, Grossman & Karlins, for appellant.
Rosemary Moskalik McVay and Dygert & Riordan, for respondent.
MURPHY, JUSTICE.
This is an appeal from a judgment of the District Court of Hennepin County affirming an order of the probate court denying the allowance of a lost or destroyed will; from an order denying petitioner discovery under Rules 34 and 37 of Rules of Civil Procedure; and from an order denying petitioner's motion for amended findings of fact and conclusions of law, or, in the alternative, for a new trial.
John F. Sandstrom, the decedent, whose considerable estate is the subject of this litigation, died on December 29, 1947. He was a former schoolteacher who, in his later years, was successful in the real estate business and did some trading on the stock market. After his death, his reputed common-law wife, Lulu S. Sandstrom, on January 9, 1948, filed a petition for the appointment of one David W. Wahlstrom as general administrator of his estate. He was survived by two nephews and three nieces, one of whom, Willard R. Sandstrom, the petitioner here, on January 10, 1948, petitioned for his own appointment as general administrator stating under oath "That said decedent died without leaving a last will and testament." On January 28, 1948, petitioner and others filed objections to the allowance of the petition of the wife for appointment of Wahlstrom as general administrator on the grounds that Lulu S. Sandstrom "was not the legal wife nor was she the common-law wife of the said John F. Sandstrom * * *."
The wife's petition for general administration was heard in probate *49 court of Hennepin County on May 6, 1948. After the taking of testimony, the objections of Willard R. Sandstrom and others were withdrawn by agreement of the parties and David W. Wahlstrom was appointed general administrator. On the same day, May 6, 1948, all claims of the nieces and nephews, who are claimants under the will alleged in this action, were compromised and settled in the probate court of Hennepin County. Thereafter, Willard R. Sandstrom, the petitioner, and all other claimants executed receipts and releases fully settling and compromising any claims they might have to the decedent's estate.
On November 27, 1948, Lulu S. Sandstrom, the reputed commonlaw wife of the decedent, died. On January 24, 1949, David W. Wahlstrom was appointed general administrator of her estate. Willard R. Sandstrom, the petitioner, on December 4, 1954, then commenced this action in probate court of Hennepin County to establish a lost or destroyed will of John F. Sandstrom. From an adverse finding of the probate court, he appealed to the district court pursuant to M.S.A. 525.72 alleging:
"That at the time of the death of the said John F. Sandstrom, there was in existence a written will duly made, executed and attested by him, the contents of which are reasonably ascertainable and which contained provisions requiring substantially as follows:
"A. The payment of all just debts and funeral expenses and request for burial in the Lutheran church.
"B. The appointment of Walter F. Anderson as executor.
"C. A bequest of the sum of Five Thousand Dollars ($5,000.00) to each of the nephews and nieces of the said John F. Sandstrom.
"D. All income and residue of his estate should be used for the benefit and to provide the livelihood for one known as Lulu Sandstrom during her lifetime.
"E. Any remainder of the said Sandstrom estate after the death of Lulu Sandstrom could be retained by the said Walter F. Anderson as his own or might be given to such charities as he may select at his own discretion.

*50 "III
"* * * that the will above referred to was suppressed, hidden and secreted and that no effort was made by the fiduciaries of said John F. Sandstrom to well and truly ascertain the existence of such will, * * *."
In his answer the administrator asserted the May 6, 1948, settlement as a defense. The petitioner's reply alleged that such settlement was obtained by false and fraudulent representations of Lulu as to the existence of a will.
At the trial in district court, the petitioner presented several witnesses who testified to the existence of a will. The petitioner relies particularly upon the testimony of two witnesses, one is Carl Kottke, a former friend and crony of the decedent, and the other Walter Anderson, a former business partner of the decedent and the remainderman purportedly named in the alleged will.
At the time of the trial Kottke was 83 years of age. He had retired as a flour-mill superintendent in 1936. It appears that he frequented brokerage houses daily and carefully watched the stock market. He testified that he first met the decedent during the depression years of 1931 and 1932, that they saw each other almost daily at the stock exchange and various brokerage houses where they traded and with the years became intimate friends. Kottke recalled an incident sometime in the early 1940's which took place at the offices of Paine, Webber & Company at which time the decedent discussed with him the subject of his will. He testified as follows:
"A. Mr. Sandstrom said, `Carl, I made a Will, I want to read it to you', and he started to read on the stock exchange 

* * * * *
"Q. Now, what did you do?
"A. I listened to it a little while and there was some changes in the stocks, things was going fast, and I said, `I am not so much interested, you tell me afterwards', and 

* * * * *
"A. * * * he said he thought it would be better to put it in his back pocket and read it to me later, so he put it in his pocket.

* * * * *
*51 "A. Yes, he said the nieces and nephews should have five thousand apiece and what is left Anderson should be the administrator or executor of it, whatever you call it.
"Q. Or executor?
"A. Executor, yes, and if there is anything left he should use that money to the best of his  keep it all himself or give it to charity.

* * * * *
"Q. * * * tell us again what he said, as to what provision he said he made for Lulu?
"A. She should have life-long income off that money and if there is anything left Anderson should take care of it the best to his ability or keep it all himself."
On cross-examination, Kottke testified as follows:
"Q. When he pulled this document out of his pocket did he take it out of his inside coat pocket or where did he have it, do you remember?
"A. He had it in an envelope.

* * * * *
"Q. And you did not read the document yourself, did you?
"A. No.
"Q. Did you have it in your hands at all?

* * * * *
"A. I just opened it up and I said, `Oh, I am not interested', and I gave it right back to him.
"Q. And did you examine it at all to see whether it was signed?
"A. No.
"Q. Did you examine it to see who the witnesses were, if there were any signatures on this paper?
"A. No.
"Q. And do you recall how many pages there were?
"A. Well, there was two, anyway.
"Q. But you did not see any signatures at all on it?
"A. No, I didn't go far enough.

* * * * *
"Q. * * * was it typewritten or was it written out in longhand?
*52 "A. That I couldn't  I don't remember.

* * * * *
"Q. Did Mr. Sandstrom say whether he had written it himself or typed it out himself?
"A. No, he just simply said he made a Will."
At another point he testified as follows:
"A. * * * He told me, `Carl, I made a Will'. He said, `I would like to read it to you', and he pulled it out of his pocket and the ticker was going and I said, `I am not interested now', I said, `tell me sometime later', but he kept on reading.
"Q. And you took it in your hand for a moment, did you, Mr. Kottke?
"A. Yes.
"Q. But you didn't read it yourself?
"A. No, no, I said, `I am not interested enough, I have got the ticker to watch'.
"Q. Did you read any part of it?
"A. I just looked at it * * *.

* * * * *
"Q. You didn't read anything?
"A. No.

* * * * *
"Q. And then he read some of it, but are you able to tell us whether he read it all or just a part of it?
"A. Well, I don't think he read it all, * * *.

* * * * *
"A. He read that the five nieces and nephews, that they should get $5,000.00 apiece."
Later on, Kottke testified:
"A. * * * first he talked about the nieces and nephews, that they should get $5,000.00 apiece.
"Q. That is the first thing you recall?
"A. Yes.
"Q. And then?
*53 "A. And then Lulu should be taken care of.

* * * * *
"A. Well, he told me what I can remember that he made the Will and he read that part, and he said, `I made a Will now that my nieces and nephews should get $5,000.00 apiece', and that stands.
"Q. Do you remember that from his saying so?
"A. Yes, he said so.
"Q. You remember it from his saying so?
"A. Yes, I never read the Will.
"Q. Not from his reading it to you?
"A. He read that to me."
At another point he said:
"A. Yes, he said, `I made a Will and the nieces should get $5,000.00 apiece and provides that Lulu * * * should have a life-long income out of it'.

* * * * *
"Q. And can you describe that life-long income any more specifically than just life-long income?
"A. It provided for her as long as she lived.
"Q. Whatever she needed?
"A. Yes, and the rest should go  Anderson should take out his  he put the money in the first place in this corporation when they incorporated, * * *.

* * * * *
"Q. It was Lulu's so long as she lived?
"A. Yes.
"Q. But if Lulu died then 
"A. He should have it.
"Q. He should have it?
"A. That's right, or he should give it to charity, if he saw fit.
"Q. Or to give it to charity, but he should have all of it, not just so much as he put in; is that correct?
"A. Well, the whole estate, what was left after Lulu died, that's the way I understood it."
Walter F. Anderson did not appear in district court. A transcript of *54 his testimony given in probate court on April 21, 1955, was read into the record. This was necessary because at the district court trial he was suffering from a mental condition and his appearance would have been detrimental to his health. Anderson had been Sandstrom's partner in the real estate business since 1921. They had been friends for 50 years. Anderson's principal occupation was that of a teacher in the rudiments of business law in the Minneapolis public schools. As such, he had some knowledge of the form, contents, and manner of execution of a will. Anderson testified that he had seen the will only once. That was about the last part of 1945 or the early part of 1946, approximately two years before Sandstrom died. On that occasion, while Anderson and Sandstrom were going over some records which were stored in a filing cabinet on the second floor of Sandstrom's home, Sandstrom took from the cabinet a document, which he referred to as his will. It was a typewritten document consisting of two pages either double or triple spaced. The document was handed to Anderson and he read it, some parts several times. Anderson stated there was no lawyer's name on the document and further testified as to the provisions:
"That all his bills be paid, his just bills, and that he be buried in the Lutheran church, and second, that I, Walter F. Anderson, be made his executor and administrator; and I think the third was  I'm pretty sure that's the order  the third was that five thousand dollars in cash be given to each of his nephews and nieces; and the next was that the income from all of his property be used for the benefit and livelihood of Lulu Sandstrom during her lifetime; and the next was that then the residue would be given to me, Walter F. Anderson, as my own, to either give to charities of my own selections or to use for my own benefit for my own lifetime  use my own judgment on that. Then it was signed. He signed "
He testified that the will contained an attestation clause; that one of the witnesses was one H.M. Orfield, a person with whom he and Sandstrom had dealt. He did not recognize the signature of the other witness. Anderson remembers the date of the will as being August 1940.
Nowhere in Anderson's testimony does it appear that he ever again discussed the will with Sandstrom though they met quite often thereafter *55 in connection with the affairs of a corporation which they owned. He testified that the will did not contain the names of the nieces and nephews but merely stated that each niece and nephew was to receive $5,000. However, he did not know whether this included the adopted daughter of one of Sandstrom's sisters. Throughout his testimony Anderson said that he could not remember the exact words of the will but was merely testifying to the gist of the will or as to what it meant to him.
After Sandstrom's death, Anderson made no attempt to investigate the existence of the will or to determine whether or not it had been destroyed or revoked. Although he thought the estate to be larger than $150,000 he never consulted a lawyer about the will because he didn't "give a darn" and he didn't want to look like a "chump" attempting to prove a lost will when he was a beneficiary under it. Although Anderson said he wanted the nieces and nephews to get the estate, he did not mention the alleged will to anyone for more than seven years in spite of the fact that he had conversations with Wahlstrom, the general administrator of both estates, and with Mr. Chalgren, the administrator's attorney, several times with reference to the estate and corporate matters relating to mutual interests.
Numerous other witnesses were called in behalf of the proponent most of whom testified as to disputes between Sandstrom and his common-law wife which indicated a lack of trust between them. There was also other testimony as to the reported existence of a will. One John Miller, a real estate broker and an acquaintance of Sandstrom, testified that Sandstrom told him that he intended to make a will leaving $5,000 or more to each of his nephews and nieces, his living brothers and sisters, and his former wife, Deborah DeVere. Miller further stated that Sandstrom had told him that Lulu would get a reasonable amount. None of the witnesses claim to have seen the will although there was some evidence to the effect that Lulu had knowledge that one existed.
Orfield, the witness said to have signed the will, was deceased and there was no evidence as to the name of the other witness. Wahlstrom, the administrator, testified that Sandstrom's safety deposit box was opened by the bank and the county treasurer in his presence and that *56 no will was found therein. He inquired of Lulu as to the existence of the will but did not remember whether she said there was or was not a will and he stated he didn't think Lulu knew either. Wahlstrom searched Sandstrom's files and records thoroughly but found no will nor anything to indicate the existence of a will. The first time that he had heard of the existence of a will was in 1954 when this action was commenced. He stated that no one at any time had ever come to him and told him of the existence of the alleged will. Wahlstrom testified that he had instructed his attorney to investigate the possible existence of a will but that the search conducted had not been fruitful.
The trial court denied the petition to allow the will and held that the petitioner did not prove that decedent died leaving a will and also held that, if the decedent ever made a will, its provisions had not been proved clearly and distinctly in accordance with § 525.261.[1] In his memorandum the trial court noted "there was no reliable testimony to prove clearly and distinctly the provisions of the alleged will," indicating not only that the petitioner's evidence fell short of proving the existence of a will but indicating his disbelief of the testimony of the petitioner's witnesses as well. Relying on O'Leary v. Wangensteen, 175 Minn. 368, 221 N.W. 430, the petitioner asserts as his principal ground for reversal that the court erred in arbitrarily disregarding the positive testimony of unimpeached witnesses whom he asserts gave credible and consistent testimony as to the existence and the provisions of the purported will. Before undertaking a discussion of this and other points raised by the petitioner, certain controlling principles of law should be noted.
*57 1. Under § 525.261, the burden of establishing that a lost or destroyed will remained unrevoked at the time of the testator's death rests upon the proponents of such will. In re Estate of Calich, 214 Minn. 292, 8 N.W. (2d) 337; In re Estate of Greenberg, 249 Minn. 254, 82 N.W. (2d) 239.
2-3-4. With reference to the sufficiency of proof required to establish a lost or destroyed will, § 525.261 provides: "No such will shall be established unless it is proved to have remained unrevoked nor unless its provisions are clearly and distinctly proved." (Italics supplied.) As we interpret this statute, it does not necessarily require that the provisions of the will be shown in the literal terms used by the testator. It is sufficient if the substance of the provisions is established. However, since the statute requires that the provisions of the will be "clearly and distinctly" proved, it is necessary that the provisions of the will be established with sufficient definiteness so that they may be substantially reproduced in writing as the testamentary disposition of the decedent's property. This intention of the legislature is manifested by § 525.262, which relates to certification by the court and provides:
"When such will is established, the provisions thereof shall be distinctly stated and certified by the court and filed and recorded."
Annotation, 126 A.L.R. 1175, 1177; 95 C.J.S., Wills, §§ 384c, 419b; 57 Am. Jur., Wills, § 981.
Moreover, the statutes comprehend the existence of a will validly executed in accordance with § 525.18. The statutes further comprehend a hearing and proof as provided for by § 525.24 and permit the admission of secondary evidence where necessary to support such proof as provided by § 525.242. In other words, the proponent of a lost will must prove its due execution just as would be the case if the instrument itself were being offered for probate. 1 Patton, Minnesota Probate Law and Practice, § 208.
5. In considering the objection that the court erred in arbitrarily disregarding the direct and uncontradicted testimony of petitioner's witnesses, it may be observed that as a general rule such testimony should be accepted as controlling, but that rule admits to many exceptions. Where such testimony is vague, evasive, equivocal, confused, or *58 otherwise uncertain it may be disregarded. 20 Am. Jur., Evidence, § 1180. In Knuth v. Murphy, 237 Minn. 225, 229, 54 N.W. (2d) 771, 775, this court after citing O'Leary v. Wangensteen, supra, noted that, while the court may not disregard positive testimony of unimpeached witnesses,
"* * * this principle is subject to the exception that such uncontradicted testimony may be disregarded if it is evasive, equivocal, confused, or otherwise uncertain, or if the facts and circumstances disclosed by the record demonstrate, or reasonably lead to the inference, that such direct testimony is contrary to established physical facts or scientific principles or is incredible in the light of the surrounding circumstances."
See, also, Hansen v. Proctor, 246 Minn. 67, 74 N.W. (2d) 281; Caballero v. Litchfield Wood-Working Co. Inc. 246 Minn. 124, 74 N.W. (2d) 404; Moeller v. St. Paul City Ry. Co. 218 Minn. 353, 16 N.W. (2d) 289, 156 A.L.R. 371. 20 Dunnell, Dig. (3 ed.) § 10344a, contains a statement of similar import.
A question similar to the one presented here arose in In re Estate of Calich, supra. In that case the alleged beneficiary who possessed the purported will at the time it was lost, and both of the alleged attesting witnesses, testified in support of the petition. There, as here, there was uncontradicted testimony as to the existence of the will, and it was argued that the trial court was without power to arbitrarily disregard the positive unimpeached testimony of the witnesses. In sustaining the order denying allowance of the will we held that the trial court was not bound to accept testimony as true merely because it was uncontradicted, where the surrounding facts and circumstances furnished reasonable grounds for doubting its credibility. Noting that the only witness who could directly dispute the facts relating to the existence and execution of the alleged lost will would be the decedent, we said (214 Minn. 298, 8 N.W. [2d] 341):
"* * * Where the only person who can directly dispute a witness is dead, the testimony of that witness should be carefully scrutinized, its reasonable probability should be considered, and for this purpose attention should be given to the circumstances surrounding any transaction *59 which the witness may narrate and his testimony compared with all the inferences derivable from the established facts."
6. Applying the foregoing principles to the testimony submitted in behalf of the proponents of the will, it does not seem to us that the court erred in disallowing the will. The most that can be gleaned from the testimony of the witness Kottke is that on a number of occasions the decedent talked to him about a will and on one occasion showed or read to him a document which he said was a will. At the time it was read or shown to him he did not examine it. While he testified that the decedent said that his nieces and nephews should have $5,000 each, he was vague and indefinite as to the other provisions of the will. At the time the purported will was either read or shown to him, his attention was either diverted or consumed by his interest in stockmarket quotations as they were being posted. He did not read the document. He did not know whether it was written in longhand or by typewriter. He did not know whether or not it was signed by the decedent. We do not think that there is testimony from Mr. Kottke which by any means establishes "clearly and distinctly" proof as to the provisions of a validly executed will, nor does his testimony have any bearing on the question of whether the will was unrevoked at the time of death.
It is not necessary to search far to find good reasons why the court would completely discount the testimony of the witness Walter F. Anderson. Although he signed a document renouncing his interest as a beneficiary, presumably for the purpose of removing any disqualification which might prevent him from testifying as a disinterested witness, he admitted on cross-examination that the proponents of the alleged lost will said "they would make it worth my while. I said, `Never mind that.'" With reference to his interest in the outcome of the litigation, there is this testimony:
"Q. How much did you think they would give you?
"A. They couldn't very well, because they didn't know how much they were going to get. They were a proportionate share.
"Q. How big a proportionate share?
"A. About equal with them.
"Q. That is, if you got this will established, you would get a *60 proportionate share with the nieces and nephews?
"A. I think so.
"Q. That's the deal they made with you at that time?
"A. They tried to, yes.

* * * * *
"Q. Now, it's your position that by virtue of this purported will, you have a right to make this money go any way you want, is that right?
"A. I don't know anything about that. All I'm doing is taking advice."
Moreover, the court necessarily considered the mental condition of the witness Anderson in evaluating his testimony. At the trial in district court in October 1956 he did not appear but a transcript of his testimony given in probate court the previous year was read. Dr. Jennings Peteler, a psychiatrist, testified that he had attended Anderson since August 1955; that prior to that time he had been treated by a psychiatrist in Duluth; that he suffered from "an agitated depression" as well as arteriosclerosis; and that his mental deterioration had been progressive going back to 1942. While the doctor did not express an opinion as to the witness' mental condition in April 1955 when he testified in probate court beyond saying that the arteriosclerosis from which he suffered was a progressive condition, he did say that at the time of the trial in district court in 1956 he would be unable to tell a coherent story and would not be a reliable witness.
Furthermore, the reason Anderson gave for waiting eight years before manifesting any interest in his legacy under the will did not appear reasonable. His testimony was to the effect that although he thought the estate was in excess of $150,000 he never asserted any right to it because he might be embarrassed. He also conferred with the administrator and his attorney on various occasions with reference to the estate and made no mention to them of his alleged interest.
We are of the view that the inferences derived from the testimony of both Kottke and Anderson and the surrounding circumstances are such that the court was not required to accept their testimony at its full value. Moreover, the court had an opportunity to observe the witnesses as they testified and was in a better position than are we to evaluate *61 their credibility.
The issue as to whether or not a will was executed and as to whether or not the provisions of a will were established clearly and distinctly, was tried before two judges, a probate judge and a district judge. As in In re Estate of Calich, supra, they had the benefit of the so-called "trial atmosphere" under which the testimony was given. We conclude that the record reasonably sustains the trial court's finding that the proponent failed to establish the existence of a validly executed will and its provisions as required by statute.
Where as here the findings of the trial court are reasonably sustained by the evidence as a whole, they will not be disturbed on appeal. Church of St. Vincent de Paul v. Brannan, 97 Minn. 349, 107 N.W. 141; Coates v. Semper, 82 Minn. 460, 85 N.W. 217; Ruff v. Manhattan Oil Co. 180 Minn 528, 231 N.W. 200; Gensler v. Feinberg, 181 Minn. 436, 232 N.W. 789; 1 Dunnell, Dig. (3 ed.) § 411.
7. On April 9, 1956, the petitioner served on the administrator interrogatories pursuant to Rules 26 and 33 of Rules of Civil Procedure. The questions propounded related to the subject of Lulu's marital status, to the identity and location of her known heirs, and to the administration of both estates. The administrator refused to answer the questions on the ground that they were not relevant to the issue of whether or not a will existed. On July 10, 1956, the petitioner made a motion under Rule 37 for an order compelling the respondent to answer the interrogatories, and a motion under Rule 34 for permission to inspect and copy certain writings, letters, reports, and memoranda in the possession of the administrator-respondent. The trial court denied both motions and the petitioner has appealed from the order thereon.
We have examined the interrogatories in the light of the record and agree with the trial court that the information requested in them does not have sufficient bearing on the issue of whether or not a will existed, or on the effect of the alleged releases given in the probate court proceedings, to warrant granting the requested information or inspection. The trial court observed that the information requested referred to matters which were not "truly germane to the issue involved in this appeal, and are matters that appellant, if his interest is established, will *62 have access to in the main proceedings in the Probate Court." The trial court further noted that "as to pertinent information and data that the appellant desires in these motions appellant has already received from the respondent, and that the appellant still has access in orderly procedures to the Probate Court for additional relief in that regard." As a prerequisite to the issuance of an order permitting discovery of documents, the moving party must show good cause. Webster v. Schwartz, 249 Minn. 224, 81 N.W. (2d) 867. It does not appear that the interrogatories propounded, or the inspection requested, might lead to relevant information on the issue of the existence or nonexistence of a validly executed will. Since the request for answer to interrogatories and the demand for inspection of documents were not supported by showing that the requested information was relevant to the issues being tried, we cannot say that the trial court abused its discretion in denying them.
8. Petitioner further contends that the administrator's appearance as an adverse party requires his removal and the nullification of the judgment. The authorities are divided on the question of whether an administrator may contest the will of the decedent. This court has held, however:
"* * * that the executors named in a will have such representative interest in the allowance and probate thereof as entitle them to appear as champions of the same in the courts of the state." In re Estate of Murphy, 153 Minn 60, 64, 189 N.W. 413, 414; Annotation, 31 A.L.R. (2d) 756.
This question was raised in a related action brought in the United States District Court of Minnesota by one of Sandstrom's nieces who resides in the State of Georgia. In his memorandum in which he discussed the Murphy case, Judge Gunnar H. Nordbye said:
"It would seem that the reasoning of that case is also applicable to an administrator so that in Minnesota an administrator has sufficient representative interest to contest the allowance of a will discovered subsequent to his appointment."
We agree with Judge Nordbye that the holding in the Murphy case *63 applies with equal force to an administrator. The basis for the administrative right of a representative of an estate to contest the will of his decedent is that he represents the heirs and beneficiaries entitled to the estate or holds the assets in their behalf and consequently has the right to see that no testamentary document is admitted to probate unless genuine. Annotation, 31 A.L.R. (2d) 756, 761.
Affirmed.
NOTES
[1] The court found:

"1. That the petitioner has failed to prove that a will of John F. Sandstrom was ever in existence, and, if such will existed, that it was unrevoked at the time of the death of the said John F. Sandstrom.
"2. That there was no evidence offered or received that the said John F. Sandstrom executed a will, if such existed, according to the law of the State of Minnesota.
"3. That neither the provisions of said alleged will, nor any one of them, has been clearly and distinctly proved in the manner required by law; that no copy of the alleged will has been found, and the only evidence of its alleged contents is vague, indefinite and unsatisfactory."