## TENA HANNAH OSBON v. LEO HARTFIEL AND OTHERS.[1]

December 3, 1937.

No. 31,472.

[1]Reported in 276 N. W. 270.

*Flynn & Mork,* for appellant.

*Arnold W. Brecht* and *E. H. Nicholas,* for respondents Leo Hart-fiel, as executor, and Amy Johnson.

*John Roberts,* for respondents Harry Osbon and Agnes Groen-wold.

JULIUS J. OLSON, JUSTICE.

Plaintiff appeals from a judgment. This suit was brought by her under the provisions of 2 Mason Minn. St. 1927, § 9405, the purpose sought being to set aside a judgment and decree of divorce theretofore rendered in a suit brought by her husband and decided in his favor. Shortly after the entry of the divorce decree and before the commencement of this suit, the husband died, leaving an estate said to be of the value of about $60,000. Her suit was brought against the executor, the beneficiaries under the will, and the heirs at law.

The basis for plaintiff's claim as stated in her complaint is that while the divorce suit was pending her then husband by fraudulent representations induced her to accept a property settlement wholly inadequate under the circumstances and that the representations made influenced her so that she withdrew her defense and permitted the husband to proceed as for want of an answer. Specifically, the misrepresentation claimed was that the husband told his wife that he had talked with the district judge who was then serving as such in the district in which the parties resided; that in this talk with the judge, so plaintiff claims her husband told her, the husband had been assured that a divorce would be granted and that there would be an allowance of only $500 as alimony; that relying upon these representations and believing them to be true she was induced thereby to sign a stipulation of settlement accept-

ing $1,200 as alimony, and the discharge of a certain judgment for costs rendered in a prior case between the same parties. See Osbon v. Osbon, 185 Minn. 300, 240 N. W. 894.

When the present suit came on for trial counsel for the parties, after conference with the judge, agreed upon the submission of certain fact issues to the jury. The first issue so submitted reads as follows:

"Did Sander Osbon on or about September 27th, 1934, falsely represent to plaintiff Tena Hannah Osbon, in substance that Judge C. T. Howard had stated to him that said Judge would grant said Sander Osbon a divorce and would allow Tena Hannah Osbon only $500.00 alimony?"

This was answered by the jury "No." Questions two and three did not require answer unless the first was answered "Yes," hence the jury was not required to, nor did it, answer them. After the verdict came in plaintiff promptly proceeded with motion for new trial, alleging as grounds therefor that the verdict was not justified by the evidence but was contrary thereto and to law; that there were irregularities in the proceedings whereby plaintiff was deprived of a fair trial; that there were errors of law occurring at the trial with regard to the admission of certain evidence. That motion was denied on August 12, 1936. Later an appeal was taken to this court, but the same was, on plaintiff's motion, dismissed without prejudice. The judge who heard the case, the Honorable George P. Gurley, was killed in an automobile accident while the case was pending on appeal. There were no findings made by the court, although when submitting the interrogatories to the jury the court stated that all other issues in the case, if such there be, were reserved for decision by the court as and when the jury's verdict came in. When the last mentioned appeal was dismissed here respondents applied to Judge Gurley's successor in office, the Honorable Charles A. Flinn, for an order for judgment on the special verdict upon the theory that the verdict settled every issue in the case, hence that there was no necessity for findings by the court. Judge Flinn adopted that view and ordered judgment accordingly

for defendants. Such judgment was entered, and this appeal is taken therefrom.

The assignments of error may be thus grouped: (1) Whether the court erred in denying plaintiff's motion for new trial on the ground that the verdict is not sustained by the evidence; and (2) whether the trial judge erred in not having made findings of fact and conclusions of law and that because thereof his successor in office, not having heard the case or the evidence adduced therein, was without authority to dispose of the case, hence that as a matter of law a mistrial resulted, thereby necessitating a new trial.

■ Plaintiff relies upon O'Leary v. Wangensteen, 175 Minn. 368, 370, 221 N. W. 430, holding that positive, unimpeached, and uncontradicted testimony may not be disregarded by the trier of fact. There is nothing new or novel stated in the Wangensteen case. As a matter of fact Justice Mitchell in Hawkins v. Sauby, 48 Minn. 69, 72, 50 N. W. 1015, 1016, stated the rule thus:

"Where the positive testimony of witnesses is uncontradicted and unimpeached either by other positive testimony or by circumstantial evidence, either extrinsic or intrinsic, of its falsity, a jury, of course, has no right to disregard it. But, although there be no direct evidence contradicting the testimony of witnesses, the jury are not bound to accept it as true where it contains inherent improbabilities or contradictions which, alone or in connection with other circumstances in evidence, furnish a reasonable ground for concluding that the testimony is not true."

That decision was handed down more than 45 years ago and ever since has been recognized as sound law. With that rule defendants do not quarrel, nor can they. It is firmly established here and elsewhere. The difficulty does not concern the rule itself but rather arises in its application to the particular case.

The "rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony; and

there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying may give rise to doubts of his sincerity and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced." Quock Ting v. United States, 140 U. S. 417, 420, 11 S. Ct. 733, 734, 851, 35 L. ed. 501, 502.

"The fact that there is no conflict in the testimony does not make the case one for the court instead of the jury, *if the evidence is for any cause inconclusive in its nature,* as for example, where different conclusions may be reasonably drawn from it, *or where its credibility is doubtful."* (Italics supplied.) Burud v. G. N. Ry. Co. 62 Minn. 243, 245, 64 N. W. 562, 563.

Several of our cases on this phase are cited in Olsson v. Midland Ins. Co. 138 Minn. 424, 427-428, 165 N. W. 474, 475 (subdivision three of opinion). There, as here, there was no evidence opposed directly to the testimony of the witness upon whom defendant relied for exoneration. There too, as here, the burden rested upon the party asserting the fact. The court amongst other things there said (138 Minn. 427-428):

"But a jury is not bound to accept testimony as true, merely because uncontradicted, if improbable, or where the surrounding facts and circumstances or what is developed on cross-examination furnish reasonable grounds for doubting its credibility. * * * Olsson is dead and the testimony of the physician cannot be directly met."

That also was the situation confronting this plaintiff. Upon her rested the burden of proof, and here, too, the author of the alleged misrepresentation is dead.

There are two witnesses in the instant case, a half brother and sister of plaintiff, aged 20 and 17 years, respectively, upon whose version of what was said by the husband plaintiff's entire case depends. The brother testified:

"Well, Tena [plaintiff] and Sander [the husband] stayed in the kitchen and my sister Jessie and I walked in the next room adjoining the kitchen, the dining room, I suppose. We heard Tena and Sander talking together, business affairs, and I heard Tena ask Sander if she could come back and Sander said that would not be fair to the others and that he had been to see Judge Howard and Judge Howard had told him he was going to give him a divorce and would only give her $500.00 and you might as well take $200.00 because after you pay your attorneys you won't have any more than that left."

The sister's version is stated in this language:

"They [plaintiff and the husband] were talking kind of low but I heard Sander say he was not going to give her more than $500.00. He had talked to Judge Howard and he was going to give him a divorce and after she had paid her attorneys she would only have $200.00 and he laughed."

These statements or representations were made about 18 months prior in point of time to the giving of the testimony in court. While these witnesses are not directly interested as a matter of law, there can be no doubt that because of the close relationship existing between plaintiff and them their testimony should receive most careful scrutiny.

This conversation is said to have taken place at the husband's home September 27, 1934. The divorce suit had then been pending since January, and the October term of court, when it was to be heard, was near at hand. Plaintiff and the two witnesses mentioned knew this. They also knew that the prior divorce proceedings were not heard by Judge Howard; instead he had called in Judge Haycraft, of an adjoining district. Is it at all likely that the husband would make any such statement as was claimed, knowing that its falsity could have been readily ascertained? Important, too, is the fact that five months later plaintiff, through her duly retained and acting attorneys, approached her husband's attorneys with a proposition of settlement later brought to fruition. This settlement took place February 26, 1935, and was consummated in

the office of plaintiff's counsel. All matters were thoroughly discussed. That she well knew what it was all about appears from her own testimony:

Q. "Is it not a fact, Mrs. Osbon, that out of the $1,200 [amount of cash settlement] you paid to Mr. Diamond and Mr. Jones an attorney fee of $200 in this divorce case?

A. "I know Jones said $100.00 apiece for $1,000.00 but Jones said *being as how they got $1,200.00* they would take $125.00 apiece. That is what Jones took out of that money for attorney fees." (Italics supplied.)

Judge Howard was no longer on the bench, having been succeeded by Judge Gurley January 1, 1935, *and they all knew of that change.* Isn't it likely that the husband's sudden death on March 31, following, leaving an estate of $60,000, had something to do with the sudden appearance of the present litigation and furnished an adequate motive for the invention of the whole story? The story in and of itself smells fishy. The husband knew that his wife was ably represented by competent counsel. He was a man of mature years and presumably possessed of at least average intelligence. As such he must have known that his statements would be promptly reported by the wife to her counsel and used by them to his discomfiture. He must have known that no judge worthy of the name could have made any such statement. He also knew from sad experience that plaintiff was not ignorant of legal proceedings. They had been married only a few months when, in the summer of 1929, plaintiff proceeded with the first divorce suit, charging impotency as a ground for the procurement thereof, later amended so as to include cruel and inhuman treatment. (Reference to the reported ·case, Osbon v. Osbon, 185 Minn. 300, 240 N. W. 894, is enlightening and helpful.)

There is nothing in the record indicating that these witnesses ever informed plaintiff's then counsel of what even then must have appeared to be a matter of vital importance. Rather the inference is irresistible that this fanciful tale was not brought to present counsel's attention until after the husband's death. Is any court

sitting in review to say as a matter of law that the jury must accept blindly and without the right of rejection such parrot-like recitation as these witnesses put forth? The jury had the right, and it was its duty, to weigh the evidence, to consider the demeanor of these witnesses, their fairness and candor or want thereof, and their manner of testifying. In fact, the entire atmosphere of this trial must have been surcharged with a feeling of conviction either for or against the truth of what plaintiff claimed. Many a seemingly airtight alibi is frequently shot to pieces by much less inherent weakness than here appears against plaintiff's supposed invulnerable assertions.

The court in submitting the case to the jury did so in language free from criticism on the part of counsel. The resulting verdict was later approved by the court. In its memorandum attached to the order denying plaintiff's motion for a new trial it said that the case was "well tried by both sides and the pivotal issue was decided adversely to plaintiff by the jury and I see no reason which would justify me in setting aside their verdict * * *." We are in full accord with the views expressed by the court.

■ What has been said under subdivision one hereof disposes of the case on its merits. Obviously, the verdict being sustained, as it is, plaintiff's hope of success ends. It now stands as a complete barrier to her cause.

Judge Flinn in granting defendants' motion for an order for judgment upon the special verdict was of the view "that the entire issue of fraud raised by the pleadings * * * was duly submitted to the jury in said cause and that the verdict of the jury therein is determinative of the entire issue," hence that there was nothing further for the court to do except to grant the mentioned motion. This is attacked as error. Even if that argument were sound (we do not intimate that it is), that would not help plaintiff at all. Her cause hinges upon the making of the representations claimed to have been made on September 27, 1934. In her complaint she places her reliance upon these as the basis for her suit. In paragraph 21 thereof she avers: "That the plaintiff herein believing and relying on the statements theretofore made by the de-

cedent at his home in regard to the conversation with Judge Howard heretofore set out and also believing that *any judge* who tried said case would carry out the promise and agreement said to have been made by the said Judge Howard was fraudulently induced, deceived, and coerced into signing said stipulation, *and for no other reason she did then and there sign"* the stipulation of settlement and received the money therein provided for. (Italics supplied.)

The binding effect of verdicts of this type is well discussed in 6 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) §§ 9830, 9831, 9832, and cases cited under notes. "The failure of the court to make findings on issues not covered by the special verdict is not a ground for a new trial of the whole cause. The remedy is a motion to the court to make the necessary findings." 6 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 9832, citing Cobb v. Cole, 44 Minn. 278, 46 N. W. 364; *Id.,* 51 Minn. 48, 52 N. W. 985.

Judgment affirmed.

