FRANK J. SHOCKMAN v. UNION TRANSFER COMPANY AND ANOTHER.
OLIVER ABRAMSON v. SAME.[1]

July 6, 1945.

Nos. 33,986, 33,987.

[1]Reported in 19 N. W. (2d) 812.

*Johnson, Sands & Brumfield* and *A. J. Berndt,* for appellants.
*Gallagher, Johnson & Farrish,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Two actions against defendants, one in which plaintiff Oliver Abramson sued for injuries and damages sustained to his person

and automobile respectively, and the other in which plaintiff Frank J. Shockman, a passenger in the Abramson car, sued for injuries sustained while riding therein, were consolidated and tried together. Defendants' motions for directed verdicts in both cases were denied. The cases were submitted to the jury, which returned a verdict in the sum of $3,050 for plaintiff Abramson and one of $4,650 for plaintiff Shockman. This appeal is from the order denying defendants' alternative motion in each case for judgment or a new trial.

On appeal defendants contend that the court erred (1) in refusing to instruct the jury that Abramson was guilty of contributory negligence as a matter of law; (2) in refusing to submit the question of Shockman's contributory negligence to the jury; (3) in instructing the jury to determine whether the lights on defendants' truck were on at the time of the accident, and, if not, whether this fact was a proximate cause of the accident; (4) in repeating portions of its instructions to the jury after the case had been submitted to it; (5) in refusing to grant a new trial for misconduct of counsel in his argument to the jury; and (6) in refusing to set aside the verdicts on the ground they were excessive by reason of passion and prejudice.

The facts in the light most favorable to plaintiffs are as follows: The accident occurred at about 5:45 a. m. March 24, 1943, at the intersection of Front and Poplar streets in the business district of Mankato. Front street is an arterial highway and the principal business street in Mankato. It runs north and south and is intersected by Poplar street, which runs east and west. For several months preceding the accident in question, plaintiffs were employed as bus drivers by the Mankato City Bus Company. Each owned an automobile and took turns on alternate days driving the other to their place of employment. No money was paid for this transportation. Defendant Elias Nichols was an employe of defendant Union Transfer Company. At the time of the accident he was driving a tractor-trailer unit belonging to his employer, on his regular run from Sherburn to Minneapolis. The tractor-trailer

unit had an over-all length of 36 to 38 feet and weight 14,200 pounds unloaded. At the time of the accident it carried an additional load of about 15,000 pounds.

On the morning in question, Abramson was driving his automobile, a 1935 four-door Chevrolet sedan, on Front street in a southerly direction, approaching the intersection of Poplar street. Shockman accompanied him as a passenger. They were on their way to work. There was a slight mist, and Abramson had his windshield wiper on. There was a heavy frost, and the streets were slippery. It was quite dark, and Abramson had the lights of his car burning and was traveling from 15 to 20 miles per hour in a normally 30-mile-per-hour zone and on his right-hand side of the highway. As Abramson approached the intersection he glanced toward Poplar street when he was approximately 55 or 60 feet to the north of the intersection. He testified that he saw the tractor-trailer driven by Nichols coming past the corner of the building on the northwest corner of the intersection; that Nichols was coming "pretty fair" and that he (Abramson) took his foot off the gas pedal at that time; that when he saw that the driver of the tractor-trailer did not stop as required, upon reaching the crosswalk, he immediately stepped on his brake; that this had little effect on his car, because the streets were frosty, and that the car skidded and kept going straight ahead; that he attempted to cut his wheel as far as he could to the right to "head up" Poplar street, but that his car continued to skid until it came into collision with the truck; that shortly prior to the collision he succeeded in turning his car a little to the right, and when his car and the truck came together his car was at an angle and collided a little behind the front of the trailer; that his car slid alongside the trailer a short distance and hit the dual wheels of the trailer with a jolt and stopped.

Abramson estimated that Nichols was traveling a little slower than he was when first observed about 25 feet from the intersection, or approximately 15 or 16 feet west of the stop sign on Poplar street. The actual contact of the vehicles occurred approximately 25 feet south of the intersection and after the tractor-trailer had

proceeded into the intersection some 15 or 16 feet. Abramson further testified that the tractor-trailer was without lights and made no stop at the intersection as it turned diagonally north on Front street. The collision occurred in the northeast portion of the intersection. Nichols, according to Abramson's wife, after the accident told her that he saw Abramson's car coming, but "thought he had plenty time to get out there."

■ Defendants contend that the speed of 15 to 20 miles an hour of Abramson's car and his failure to stop after observing the truck in plain view indicate such lack of control of his automobile and of care in the operation thereof as to make him guilty of contributory negligence as a matter of law. In discussing this question, counsel for defendants at some length reviews the testimony of various witnesses, the conclusions he draws therefrom, the apparent conflict between the oral testimony and the physical facts, and the improbability of the facts as related by plaintiffs. These would appear to be largely questions going to the credibility of the witnesses and proper ones for the jury. This court cannot well review the many conflicting statements of evidence and theories and the inferences to be drawn therefrom, weigh them, and determine which of the witnesses are giving correct versions of the accident. At best, as we have stated previously, witnesses can only give their best recollections of what occurred some time prior to their testimony; they cannot be expected to accurately relate every detail of that which they have had but a moment to observe. That there always will be discrepancies, conflicts, and inconsistencies in cases involving automobile collisions goes without saying. The jury could well believe that the accident occurred because of the negligence of plaintiffs, or they might properly find that plaintiffs were free from negligence in connection therewith. That is their function. Here, it might properly be concluded that Abramson was using caution in driving that morning; that he had his windshield wiper on; that he was driving at a speed of 15 to 20 miles per hour; that the tractor-trailer was proceeding without lights and failed to stop at the intersection, as required; that he had a

right to expect that Nichols would observe the law and would bring his heavy equipment to a stop before coming onto the intersection; that when Abramson first observed that Nichols was not going to do this, he (Abramson) immediately applied his brakes, but could not bring his car to a stop because of the slippery condition of the pavement. The fact that his car skidded 60 to 65 feet after application of the brakes would not of itself indicate contributory negligence. In Bayers v. Bongfeldt, 201 Minn. 546, 277 N. W. 239, this court held that, where brakes were applied approximately 50 feet from the intersection involved and where the car had skidded in a straight line into the other car, the question of negligence and contributory negligence of the parties was properly for the jury. Therein this court stated (201 Minn. 548, 277 N. W. 240):

"The claim of plaintiff is that, as a matter of law, he was free from contributory negligence and defendant was guilty of negligence. He says that defendant must have been driving at a negligent and excessive rate of speed because of skid marks, some 35 or 37 feet in length, made on the highway, and the violence of the impact of defendant's car with plaintiff's. He charges, too, that this is evidence of inattention. Defendant, on the other hand, charges that plaintiff came into the intersection at a greater speed than stated, that he did not watch for other traffic, that he miscalculated the speed of defendant's car, and that the accident was caused solely by plaintiff's negligence. It is plain that the conclusions to be drawn from the evidence depend on the weight attached to the respective versions of the parties. In a case such as this, where conflicting inferences may be drawn from the evidence, negligence and contributory negligence of motorists involved in a collision at an intersection are fact questions for the determination of the jury."

Likewise, in Mechler v. McMahon, 180 Minn. 252, 230 N. W. 776, where a plaintiff had skidded 70 to 80 feet before stopping on a

slippery pavement, we held that the question of contributory negligence was for the jury.

Here, Abramson had the right to assume that Nichols would observe the law of the road; and, while it is true that he could not rely upon this assumption in the face of obvious and imminent danger, it is apparent, if Abramson's testimony is to be believed, that the moment it became apparent to him that he was in obvious and imminent danger he exercised reasonable precautions and took reasonable measures to bring his car to a stop. We feel that under all the circumstances it was properly a question for the jury whether he exercised the care necessary, and that it would have been improper to hold him guilty of negligence as a matter of law.

As we have stated, the question of contributory negligence is always one for the jury unless the evidence is susceptible of only one reasonable inference. In Salters v. Uhlir, 208 Minn. 66, 69, 292 N. W. 762, 764, similar in some respects to the case at bar, we stated:

"* * * As a reasonable man, plaintiff was entitled to assume that defendant would yield the right of way at least until a reasonable basis to conclude the contrary appeared. If this were not so, the right of way would be of little value and ordinary traffic on highways bottlenecked at every private driveway on which a vehicle was approaching the main thoroughfare. Defendant owed that duty and on the present record clearly violated it. * * * Until a reasonable ground appeared to make plaintiff appreciate that defendant was going to enter the highway irrespective of plaintiff's presence he had a right to assume that due care would be exercised. It was for the jury to decide whether plaintiff apprehended the risk seasonably and thereafter conducted himself as a reasonable man. This would include, among other things, the determination of whether the brakes were applied seasonably and properly and whether, with the use of due care, the accident could have been avoided. * * *

* * * * *

"On the record, we do not think that if the most favorable evi-

dence is taken and the most favorable inferences drawn that it can be said that reasonable men would all conclude that plaintiffs' case fell with the weight of its proof of contributory negligence.

' "* * * In automobile collision cases this court has adopted a policy of hesitation when contributory negligence as a matter of law is attempted to be founded on estimates. * * * We do not think that this is a case to rely upon estimates to find contributory negligence."

■ With reference to Shockman, the trial court instructed the jury as follows:

"* * * you will bear in mind that he was a passenger in Mr. Abramson's car; he was not driving the. motor vehicle; he apparently was looking and observing as they went along, but he was not in charge. Therefore, you are instructed that the defendant cannot claim that Mr. Shockman was guilty of this so-called contributory negligence * * *."

There is nothing in the record to indicate that Shockman had any cause to be alarmed or to exercise any additional caution on account of the manner in which Abramson was driving. While the day was frosty and misty, the evidence indicates that the windshield wiper on the car was operating and that Shockman was assisting Abramson in keeping watch for traffic. It is difficult to ascertain what additional precaution he might have taken to prevent the accident. Under the circumstances, we hold that the court properly instructed the jury that Shockman was free from negligence as a matter of law. See, Thorstad v. Doyle, 199 Minn. 543, 273 N. W. 255; Vukos v. Duluth Street Ry. Co. 173 Minn. 237, 217 N. W. 125; Wicker v. North States Const. Co. Inc. 183 Minn. 79, 85, 235 N. W. 630, 632; Burgess v. Crafts, 184 Minn. 384, 238 N. W. 798; Findley. v. Brittenham, 199 Minn. 197, 271 N. W. 449.

Nor can we find anything in the record to uphold defendants' contention that the parties were occupying the position of principal and agent or were participants in a joint enterprise. Under the authorities of this court, there was no evidence which would

justify a finding of joint enterprise. See, Truso v. Ehnert, 177 Minn. 249, 225 N. W. 98; Murphy v. Keating, 204 Minn. 269, 283 N. W. 389. Shockman was not in any manner responsible for Abramson's car. He paid him no money for riding, made no contributions to the repair or upkeep of the car, and exercised no voice in its operation or control. As stated in Goldberg v. Cook, 206 Minn. 450, 457, 289 N. W. 512, 515:

"Plaintiff was not driving the car and had no control or right of control. * * * So far as appears, she was not aware of any danger nor was there anything to warn her that danger was imminent until the collision was unavoidable and it was impossible for her to do anything to prevent it."

3. Defendants urge that the court erred in failing to instruct the jury that Nichols' failure to have on his lights was not a contributing cause to the accident in view of Abramson's testimony that he observed the tractor-trailer for some distance prior to the accident. On this question the court instructed the jury as follows:

"Now, the court will instruct you in reference to lights, not perhaps because it is very important in this case, because the plaintiffs say they could see the truck, so that whether it had lights or not, apparently due to the lights which there were on the street this truck was visible to them, but there has been talk of lights and therefore the court will instruct you briefly in reference to lights at the proper time.

\* \* \* \* \*

"* * * It is not necessary to define the number of lights which are required on a truck of this kind because of the fact you know without any definitions substantially how trucks are rigged up, and further, because of the fact that perhaps the question of lights is not as important as the question of whether Mr. Nichols, the driver of the truck, stopped, * * *."

Defendants concede that whether or not the lights were on was properly a jury question in view of the conflicting evidence thereon,

but urge that the absence of lights had no connection whatsoever with the accident.

We do not feel that the absence of lights on the truck may not have been a contributing cause of this accident. The purpose of lights on a vehicle is not only to permit the driver to observe traffic, but also to permit other travelers on the public highway to ascertain and determine its presence so that they may guide their own actions accordingly. While it is true that Abramson did observe the tractor-trailer at all times, it is reasonably probable that, had the lights thereon been lighted, he might have determined at an earlier point that the driver thereof did not intend to stop at the intersection, but, on the contrary, intended to proceed across it in violation of law. Even if this observation by Abramson had been made only a moment prior to the time the tractor-trailer actually became visible to him, it is reasonably probable that this might have permitted him to apply his brakes in sufficient time to avoid the collision. The presence of lights would have permitted him to determine more accurately the location, direction, and speed of the tractor-trailer, and to observe more clearly its progress into the highway and the increasing danger as a result thereof.

Further, the court clearly indicated to the jury that the question of lights was not important in the case and specifically instructed that if the jury did find negligence it must also determine "whether that negligence was the proximate cause of the accident, the direct, the immediate cause." Under all the circumstances, we hold that there was no error in the instructions on this question. See, Krinke v. Gramer, 187 Minn. 595, 246 N. W. 376.

■ On two separate occasions after the case had been submitted to the jury, members thereof returned to the court for additional instructions. On the first occasion the following took place:

"Foreman: There was something in the minds of some of our men as to whether the truck driver should use larger precaution in entering a through highway than somebody else, I believe that was it, or he wanted to know the traffic laws a little better in regard to entering a through highway.

"Court: About all I can tell you is what I told you this morning, Ladies and Gentlemen of the Jury, but I will repeat that in order that you may have no difficulty in recalling what it was that I said.

"In regard to entering a through highway, the law provides as follows: First, that the driver of the vehicle shall stop at the entrance to the through highway and that he shall yield the right-of-way to other vehicles which have entered the intersection from said through highway, or which are approaching so closely on said through highway so as to constitute an immediate hazard. That is the requirement. He shall come to a stop. He shall look, of course, to see whether there are any vehicles on the intersection which are on the through highway, or whether there are vehicles approaching from either direction which are so close as to constitute an immediate hazard if he undertakes to pull into that intersection.

"Then the same statute further provides that the driver, that is, the one who is entering an intersection, having so yielded, may then proceed, and the drivers of all other vehicles approaching the intersection on the through highway shall yield the right-of-way to a vehicle so proceeding into or across the through highway. Now, do you understand that?

"Juror: Yes."

On the second occasion the following took place:

"Court: Do I understand that the jury desires additional instructions?

"Foreman: That's right. There is still a difference of opinion as to whether Shockman could collect if the plaintiff driver was guilty of negligence.

"Court: I told you this morning, and I will repeat again, if you should find from the evidence that the driver of the truck was negligent and that his negligence contributed directly to the cause of the accident, and, if in addition to that, you should find that Mr. Abramson, who was driving the car in which Mr. Shockman was riding, if you should find that he also was guilty of what I

have defined as contributory negligence, if you find that situation then Shockman, the passenger, could still recover damages for his injury. I also told you this morning that if you found the accident was due solely and proximately to the negligence of Abramson and if you found there was no negligence on the part of the driver of the truck, then of course Mr. Shockman could not recover from this defendant; but, if you find that both of the drivers were negligent and that the negligence of both contributed directly to the accident, Mr. Shockman, the passenger, could still recover from this defendant, the Union Transfer Company, and from the driver of the truck. Does that make it clear?

"Foreman: It's clear in my mind. I don't know about the rest of the jurors.

"Court: Does that make it clear to all of you?

"Jurors: Yes.

"Court: The reason for that is that Mr. Shockman was not driving the automobile, he was simply a passenger. If both of the drivers were careless and negligent he could still recover from the defendant which he has sued. That is the reason for that law.

"Foreman: There seems to be an opinion of some or particularly one of our men that if one of the boys collects they must both collect or no one.

"Court: No, that is not the law. You can find a verdict finding that Mr. Abramson is not entitled to recover in his case and at the same time find a verdict that Mr. Shockman is entitled to recover.

"Foreman: It's clear in my mind."

We find no error in the above instructions. As indicated, in form they follow the instructions given to the jury by the court in its original charge. The court clearly stated the statutory rules and law applicable, and left it to the jury to determine whether or not the negligence claimed had actually occurred and whether it was the proximate cause of the accident. The interests of justice require that the jury have a full and complete understanding of

the rules of law applicable to a case in connection with the various matters it is called upon to decide.

Defendants' counsel was not present when the additional instructions were requested and given. Defendants contend that this is error justifying a new trial. This court has suggested that it is better practice to notify counsel concerning the giving of additional instructions and to wait a reasonable time for counsel's arrival. However, it has further held that the failure to do so does not constitute error requiring the granting of a new trial. The rule is set forth in 6 Dunnell, Dig. & Supp. § 9790, as follows:

"If the jury, after retiring, come into court and request further instructions, or if the court recalls the jury to correct its instructions, the additional instructions may be given *in the absence of counsel.* The trial of a case is not concluded until a verdict has been recorded or the jury discharged. It is the duty of parties and counsel to remain in or be represented at the court during its sessions until the trial is ended. And it is no part of the duty of the court to send after parties or counsel who have absented themselves from the courtroom before the trial of their cause is concluded. When a jury returns into court for further instructions, it is customary to send for counsel and to wait a reasonable time for their arrival, and it is desirable that this be done when practicable; but this is a matter of courtesy and not of right." (Italics supplied.)

See, Greear v. Paust, 192 Minn. 287, 256 N. W. 190; Humphrey v. Monida & Yellowstone Stage Co. 115 Minn. 18, 131 N. W. 498 (the latter case holding the presence in court of counsel for one party only does not change the rule).

■ Counsel for plaintiffs, referring to the failure of defendants to call Dr. Nilson, who had examined plaintiffs twice and who was in the courtroom during the trial, stated:

"* * * I wonder if that was the reason. There are certain things about this case that I don't like, but I wonder if it wasn't because Dr. Nilson would have found much more than was testified .

to by our own doctor, I wonder if Dr. Nilson had testified on that stand whether there were certain conditions and extent of injuries that the doctor would have found which were much worse than Dr. Mickelson stated."

And further:

"* * * Dr. Nilson examined him. Is that true? If that wasn't true, don't you think that Dr. Nilson would have been sitting right in that chair and telling you that it is not true? Dr. Nilson made two examinations of both of these boys. He tells you about the headaches, how they come and go."

Again:

"Why didn't they put Dr. Nilson on the stand and have him testify as to that clavicle?"

And further:

"* * * If that wasn't true then Dr. Nilson would have been on the stand telling you that it wasn't true."

The evidence disclosed that Dr. Nilson had examined both plaintiffs on one occasion and plaintiff Shockman on two occasions. This court in Guin v. Mastrud, 206 Minn. 382, 386, 288 N. W. 716, 718, stated:

"Misconduct of plaintiff's attorney in eliciting that plaintiff had been examined at the request of defendant by two other medical experts besides Dr. Pierce * * * neither of whom was called by defendant to testify. When plaintiff had gone to the trouble of submitting to the examination of three medical experts of defendant's selection, and only one is called to give an opinion as to the conditions found, plaintiff had the right to argue that the two not called would have given testimony more favorable to him than to defendant. We need only cite the case of M. & M. Securities Co. v. Dirnberger, 190 Minn. 57, 250 N. W. 801, where the subject is adequately treated and numerous authorities listed."

Since the rule has been well established that the unexplained failure of a party to produce a witness who knows of the facts

and who presumably would testify favorably to such party justifies an unfavorable jury inference, counsel for plaintiffs here, in his argument to the jury, was properly entitled to comment on defendants' failure to produce Dr. Nilson. It is to be noted in this connection that the statement complained of did not state positively that the jury might indulge in such presumption, but rather was limited to counsel's statement that he "wondered" if there were certain conditions and injuries the doctor would have found which were much worse than Dr. Mickelson stated. We feel that such language did not violate the above rule, since it was still left to the jury to indulge in the presumption or to disregard it, as in its own judgment it might determine.

■ Defendants urge further misconduct on the part of plaintiffs' counsel in his argument to the jury in suggesting the exact amount of the verdicts in dollars which he felt should be returned in the cases. In this connection counsel stated:

(In the case of plaintiff Abramson), "We believe that $5,000 is not too much for that boy's suffering."

(In the case of plaintiff Shockman), "We ask $6,000 more for him. We do not believe that we have asked for anything which we are not entitled to. We believe it is fair."

In Symons v. G. N. Ry. Co. 208 Minn. 240, 250, 293 N. W. 303, 308, in commenting upon a similar statement, this court stated:

"* * * Upon request the court below gave a vigorous charge covering the matter excepted to in which he instructed the jury that it was for them and not counsel to determine the amount of damages, if any, and to determine that question themselves. No further exception to that part of the charge was taken, nor could it well be. The instruction cured the error, *if any*, arising from the claimed misconduct." (Italics supplied.)

Outside of the foregoing case, this court has not touched upon this question. In the case cited, we did not hold that the comment on the amount counsel might expect constituted error. We do not feel that such a comment should constitute error. It would seem

that in actions such, as this a jury may hear counsel's argument as to the amount of his client's loss or damages, based, of course, upon the evidence; and, likewise, it would seem that counsel in defending such a claim may vigorously argue to the contrary on the same question. In the last analysis, under the court's instruction, it is for the jury to determine which counsel gives the more nearly accurate estimate. In the instant case, the verdicts of the jury were considerably less than the amounts proposed by counsel, which in itself indicates that the jury used its own discretion in determining this question. Under such circumstances, it is difficult to see how the remarks of plaintiffs' counsel could have prejudiced the jury or been made the basis of error requiring a new trial. The court's instruction to the jury in the instant case made it clear that it was for them to determine the amount of damages suffered by plaintiffs. In its instructions on this question, covering over three printed pages of the record, the court gave to the jury the correct rule to be applied in measuring damages if they found for plaintiffs. A careful examination of these instructions indicates that they are correct throughout. Certainly, the jury must be presumed to have understood therefrom that it was their function to measure the damages suffered by plaintiffs and to fix the amount thereof.

■ Nor do we feel that the damages awarded were excessive. The verdict in the Abramson case was $3,050. Abramson is married and has one child. He sustained a fracture of his right collarbone, which healed with an overriding, thereby causing a permanent deformity; a severe laceration of his left ear practically severing the upper third thereof; and an injury to the lower part of his chest in the vicinity of the eighth rib. The ear required six stitches and was extremely painful. There was no disfigurement, but it still caused trouble at the time of the trial, more than a year after the accident. He testified that the hearing in his left ear was a little below normal, that he had headaches off and on, that on the "whole side of the head" there was a "tight feeling," and that proper circulation was not taking place. He further testified that

there was a buzzing and ringing in his left ear from time to time and, although no sharp pain, that headaches developed on his left side in the region of his ear. The shoulder fracture continued to cause trouble at the time of trial, particularly on overhead usage. X-ray exhibits indicated deformity resulting therefrom. He proved special damages of approximately $1,350, leaving $1,645 to cover the above described injuries. Clearly, such amount is not excessive.

■ The verdict in the Shockman case was for $4,650. He is married and has two children. His injuries were serious. He remained in the hospital for eight days and was confined to his home for a considerable time after that. He suffered fractures of his left cheekbone, the lower lateral wall of the antrum, and a slightly impacted fracture of his nose. There was considerable hemorrhage and swelling present. The left side of his face was severely injured. The upper jawbone was broken. He suffered considerable pain and was required to be on a special diet for six to nine months following the accident because of difficulty in opening his mouth. At the time of the trial he testified, "It's almost normal now." He still experienced trouble with his teeth, which seemed numb, and also suffered pain in his jaw at intervals. He had trouble with his vision up to the time of trial. In addition, he still had an area of anesthesia on the left side of his face commencing at the temple and extending down into his teeth and covering a portion of his nose. For a period of nine months following the accident he suffered headaches, which had disappeared at the time of the trial. His shoulder still bothered him, particularly if he raised his arm above shoulder level. The injuries had been extremely painful. Medical testimony indicated that on May 20, 1944, more than a year after the accident, he still had residual cloudiness where the bones in his face had been injured, indicating sinus difficulty. The left side of his face is narrower than the right as a result of the injury suffered. His doctor testified that the anesthesia in the face and the numbness suffered in the teeth indicated injury to the nerve ends, which are slow in healing. In addition to the foregoing injuries, he established special damages of ap-

proximately $643. We hold that the verdict in his case for the injuries described and the special damages proved was not excessive.

Affirmed.

