STATE v. CARL ENGSTROM.[1]

May 21, 1948.

No. 34,546.

L. D. Barnard and Briggs, Gilbert, Morton, Kyle & Macartney, for appellant.

Roy A. Hendrickson, County Attorney, and George E. Hulstrand, Assistant County Attorney, Kandiyohi County, and S. B. Oyen, County Attorney, Chippewa County, for the State.

MAGNEY, JUSTICE.

In a proceeding to determine paternity, defendant appealed from an order denying his motion for a new trial after a verdict finding him guilty.

The only question seriously urged on the appeal is whether the evidence reasonably supports the verdict.

Complainant, unmarried and about 27 years of age, gave birth to an illegitimate child on April 6, 1946. For a number of years she had worked a large part of the time as domestic in the home of her brother-in-law and sister, George and Melvina Engstrom, on their farm near Renville. In the summer of 1945 she worked there. Defendant, brother of George, lived on a farm about a mile and a half away with his unmarried sister, Mabel. The brothers exchanged

---

[1]Reported in 32 N. W. (2d) 553.

work, and, while helping George, defendant had his meals there also.

Complainant testified that she had known defendant ten years; that the first time she went out with him was many years ago; and that during 1945 she kept company with him. She also said that she went out with Oliver Grove once in a while, but with defendant most of the time; that she "kept company with Carl" during 1945. Numerous witnesses who were in a position to know testified that they never knew of defendant taking her out. No one testified that they had ever seen them out together. Defendant said that at one time in the latter part of November, at her request, she rode with him to town. Aside from this instance, he denied that he ever took her out.

Complainant said defendant came to her sister's house where she was working on Saturday afternoon, June 30, 1945, at about four o'clock. She is positive about the date and time. She said that he used force and overpowered her and that she had intercourse with him, and that it was the first time she had intercourse with him. If he is the father of her child, she says that it is the result of that intercourse; if she did not have intercourse with him on that date, he is not the father of her child. She made no complaint to her sister or to anyone else about defendant having overpowered her nor that she was pregnant. She testified that her sister, who was pregnant, went to town that day to see the doctor and to have a checkup and that she left in the afternoon. She is sure of the date because her sister went to see the doctor at Renville. She says that her sister and brother-in-law left before supper, and she makes no mention of who did the chores that evening. Her sister and her brother-in-law said that they were home all day; that they went to Renville that evening at about seven o'clock, after supper and chores; that they took their two children, aged three and six, with them; that they asked complainant to go along, but that she said she could not because Oliver was coming and she was going to the circus with him; that Mrs. Engstrom, the sister, first went to see the doctor for a checkup; that after she had seen the doctor she and her husband and the children went to the circus; that Mrs. Engstrom, because of her pregnant condition, remained in the car while her husband and the two chil-

dren saw the circus. They testified that after they had returned home and gone to bed Oliver Grove's car drove into the yard about 11:30, and complainant stepped out of it. They are positive that it was Oliver's car and that Oliver was driving it. According to them, complainant said afterwards that she had been out with Oliver. Complainant testified as positively that Oliver had not come to get her that night and that she did not get out of his car at 11:30. She said that she was still there when her sister and her husband returned from town. She also said that the two children were home with her. Complainant's sister and her husband testified that Oliver had called on complainant for a number of years, but never steadily until 1945; that he would call once or twice a month. The last time he was there, according to them, was in November. He lived 18 miles away. Complainant admits that she commenced keeping company with Oliver many years ago; that she went with Oliver to a show at Renville on June 16, but denied that she went with him after that. In all her testimony relating to her association with Oliver she was very evasive. In the examination in municipal court, she testified she could not get married to Oliver because they were related.

Complainant said that she had intercourse with defendant again on July 21 at her sister's house, and that no one was home. She was asked, "About what time of the day?" and answered, "I don't remember." Defendant and other witnesses testified that on July 21 they went to Little Falls to get some pigs and returned about four o'clock. After hearing this testimony, and in rebuttal, complainant stated that defendant came over there "in the evening time." She also testified that she had intercourse with him every week until November. She said that she went out with defendant every week end from July until the last week end in November; that he would call for her about eight o'clock. As stated before, numerous witnesses who were in a position to know claimed that they had never seen them out together.

Complainant testified that in the fall she and defendant were parked along the road a half mile from her sister's place; that she then told him he had got her into trouble; and that they would have

to get married. Later on, she testified that in January, at her sister's house, he told her that she was pregnant; that he did not say anything else and that he had intercourse with her that day. If she had already told him that she was pregnant, there seems no occasion for his telling her so. She was asked, "How did he know?" (that she was pregnant), and answered, "Well, he should know, he had intercourse with me many times." He admits that in November she was out hanging clothes at her sister's and that he told her, "You look like you are pregnant," to which statement no reply was made. After the child was born, she wrote defendant a letter asking for money and that he pay the doctor bill. Later on she saw him several times and wanted him to marry her. He insisted that he was not guilty.

The conviction rests on her uncorroborated story and the birth of the child.

In 7 Am. Jur., Bastards, § 124, the testimony of the mother is discussed. It is there stated:

"* * * The English Statute of 1834, and similar statutes subsequently enacted, expressly require, as a condition of an order of filiation, that the evidence of the mother of the bastard child 'shall be corroborated in some material particular by other testimony.' In this country, however, statutes have not, generally, expressly required corroboration of the testimony of the complainant in a bastardy proceeding, and it is well settled that in the absence of a statute requiring it, such corroboration is not essential to a conviction, provided the mother's testimony is credible and is sufficiently clear and convincing; in other words, a conviction will not be denied or set aside merely on the ground that it is based on the mother's testimony alone."

In this state there is no statute requiring corroboration. A conviction may be had on the uncorroborated testimony of the complainant. But every conviction had on the uncorroborated testimony of the mother should not be permitted to stand. The testimony of the mother must be sufficiently clear and convincing. Each case has its own set of facts. In this case, there are some weaknesses in the

testimony of some of defendant's witnesses. There are also material weaknesses in the testimony of complainant, and this conviction is based entirely on her story. The only corroboration is the birth of the child. The differences in the stories told by plaintiff and by defendant and his witnesses cannot be accounted for on the basis of mistake. False testimony was deliberately given by one side or the other. Another trial may reveal where the truth lies. When an unmarried woman charges a man with being the father of her child, he, if innocent, is met with an almost impossible situation. The sympathy of the jury is naturally with the unfortunate mother. When she tells them under oath that defendant is the father of her child, they conclude that she must know who the father of her child is, and that when she accuses defendant that should settle the matter. Counsel for defendant in his argument before this court stated that in this kind of a case "if you are nominated, you are elected."

Under the facts in the case, the verdict, based as it is upon the uncorroborated statement of complainant, which is not sufficiently clear and convincing, is, in our opinion, so against the weight of the testimony as to require a new trial.

Order reversed.

PETERSON, JUSTICE (dissenting).

This case involved only the determination by the jury of a disputed question of fact upon conflicting evidence. An examination of the evidence is convincing that the jury was warranted in believing that the state's witnesses told the truth and that the witnesses for the defense not only did not do so, but that the defense viewed as a whole had, as we said in State v. Hankins, 193 Minn. 375, 379, 258 N. W. 578, 580, the earmarks of "home manufacture."

As we pointed out in State v. Schmidt, 155 Minn. 440, 193 N. W. 954, where there was a similar fact dispute, the appellate court should view the evidence in the light of the trial atmosphere, as the jury did.

Here, there had been a preliminary hearing, at which complainant's version of the facts had been revealed and explored. She there

testified that she became pregnant as the result of intercourse with defendant which occurred at about four o'clock in the afternoon of June 30, 1945, in the farmhouse of her brother-in-law and sister, George and Melvina Engstrom, while they were in Renville to consult a physician concerning Melvina's pregnancy. Complainant had been employed by and lived with George and Melvina. She also testified at the hearing that she went out on week ends with defendant regularly from July 21 until November and that on every such occasion they had intercourse.

At the trial in the district court complainant's version was the same as it was at the preliminary hearing. A physician and surgeon testified that she might have become pregnant as the result of intercourse on either June 30, as she claimed, or on July 21. The evidence of the state was ample to sustain a conviction. State v. Tofteland, 216 Minn. 128, 11 N. W. (2d) 826; State v. McIlraith, 212 Minn. 536, 4 N. W. (2d) 342; State v. Hanke, 202 Minn. 47, 277 N. W. 364; State v. Cotter, 167 Minn. 263, 209 N. W. 4; State v. Schmidt, 155 Minn. 440, 193 N. W. 954; 1 Dunnell, Dig. & Supp. §§ 838, 840.

The defense undertook to meet and to overcome the state's case by what it hoped would appear to the jury to be indisputable proof that defendant was not only not the father of the child, but also that he never had sexual intercourse with complainant. The defense's evidence consisted of evidence to show (1) alibis not only for the acts of intercourse occurring on June 30 and July 21, but for every occasion during July, August, and September testified to by complainant; (2) lack of opportunity for sexual intercourse amounting to insulation of defendant from complainant; and (3) contradiction of practically everything complainant testified to on direct examination. The witnesses to substantiate the defense included defendant, some of his relatives, and some of his friends.

The alibi witnesses consisted of defendant, his sister Mabel Sandberg, who was then unmarried, Ed. Sandberg, who later married her, Stanley Johnson, and Ranco Negen. Defendant testified that because it rained on June 30 he worked all day around his barnyard, which was about one and one-half miles distant from George's farm;

that he did not go to George's farm on that day; that he did not have sexual intercourse with complainant on that day or at any other time; that in the evening he and Mabel, who lived with him, went to Renville; that on July 21 he, Johnson, and Negen went to Little Falls to buy some pigs; that they returned late in the afternoon; that after dinner he and Mabel went to Renville, where they spent the evening together; and that he had not been out with complainant at any time, except once in November 1945, when she took a trip to Renville with him in his car. Mabel testified that she knew that defendant was working around his own farm during the entire day of June 30; that in the evening defendant and she went to Renville, where they attended a circus; that on the night of July 21 defendant and she were together in Renville; that she knew that they were together that night because it was a Saturday night and because, as she said, "I always went with him most Saturday and Sunday nights." Ed. Sandberg, who was then Mabel's so-called "boy friend," testified that defendant and Mabel went to Renville together *every* Saturday and Sunday night during June, July, and August 1945, and that on those nights Mabel and he sat in his car while defendant went about town. Johnson testified about the pig-buying trip. Negen testified that defendant and he were together generally on week ends, and that, while they may not have been together on some Saturday nights, they were *always* together on Sunday nights; and that during the evening on July 21 defendant and he were together drinking beer in a restaurant in Renville. Not only did Ranco claim to remember this particular day, but also that he *distinctly* remembered *every* week end in 1947 up to the time of trial, *every* one in 1946, "quite a few" of the week ends in 1945, and "about some of every week end" in 1944.

To show lack of opportunity for sexual intercourse between defendant and complainant in the farmhouse on June 30, George and Melvina testified that they were at home during the afternoon and went to Renville in the evening and not during the afternoon, as complainant testified. Their versions as to what they did in the evening do not agree. Melvina testified that they first went to the

doctor's office; that afterward they went to George's car near the circus; and that she sat in the car alone while George and their children, one about six and the other about three years old, attended the circus. George's version was the same, except that he made no mention of having been to the doctor's office. Neither of them testified as to the name of the doctor. Neither the doctor nor his office assistant was called as a witness, nor were his office records produced to show when, if at all, Melvina was in his office. On the motion for a new trial, the defense attempted to bolster the testimony of George and Melvina that they were at the circus in the evening by the testimony not of the doctor or his office assistant or by his records, but by three witnesses who claimed to have seen George and the children at the circus. To show entire lack of opportunity for sexual intercourse between defendant and complainant, Melvina testified that she exercised such vigilance and watchfulness over defendant and complainant that they had no opportunity for being together or for conversation without her knowing about it, much less for sexual intercourse. Mabel gave similar testimony as to her vigilance and watchfulness over defendant. Then, on top of this, defendant himself testified that he had never been out with complainant, and other defense witnesses gave negative testimony that they had never seen defendant and complainant out together.

In addition to the contradiction of complainant's testimony implicit in the defense testimony concerning the alibis and the lack of opportunity for the parties to have sexual intercourse, the defense undertook to contradict her with respect to other matters. For example, on direct examination defendant not only denied complainant's testimony to the effect that during the fall of 1945, when they were sitting in his car, she told him that she was pregnant as a result of their relations and that she then demanded that he marry her, but also all knowledge of the fact that complainant had been pregnant until after the child was born, when she notified him of the fact by letter. On cross-examination, however, he testified that in November 1945, when she was hanging out clothes, he told

her, "You look like you are pregnant." At that time she obviously was pregnant.

In rebuttal, complainant testified that she and defendant were together in a restaurant in Renville under such circumstances that Ed. Sandberg saw them there. Further, she testified that on another occasion she was with defendant, his cousin Lois Hillstrom, and Negen, and that on that occasion defendant wanted her to sit in the back seat of his car with Negen, but that she declined to do so. Neither Sandberg, defendant, Lois, nor Negen was called to deny complainant's testimony in the respects mentioned.

1. The jury was warranted in believing that the testimony concerning the alibis was false *in toto*. Because there was basis for believing that defendant and Mabel had testified falsely with respect to other matters, the jury might well have believed them to be entirely unworthy of belief, and, because that was true, the jury was justified in disbelieving their testimony as to the alibi for June 30.

The testimony concerning the alibi for July 21 was absolutely incredible. Here, the versions of the different witnesses not only vary, but they were also in double and triple conflict. Mabel testified that defendant and she were together in Renville. Ed. Sandberg testified that Mabel and he were together in his car at the very time Mabel said defendant and she were together. On top of all that, Negen testified that defendant and he were in a restaurant at that very time drinking beer. Now, it is utterly impossible that at one and the same time defendant could be with Mabel in Renville and with Negen in a restaurant drinking beer and that Mabel could be about town with defendant and with Ed. Sandberg in his car. The same is true of the alibis for the other Saturday nights. Mabel had defendant with her *most* Saturday nights; Negen had defendant with him *every* Sunday night and *some* Saturday nights; and Ed. Sandberg had Mabel with him in his car *every* Saturday night. Of course, at one and the same time defendant could not be with both Negen and Mabel, and Mabel could not be with both defendant and Sandberg.

An alibi is a valid defense, and when it is established it is a complete one. But an alibi is easily fabricated, and, because that is true, the rule of law corresponds with common experience that the testimony in support of an alibi should be subjected to the most searching scrutiny. State v. Duddy, 152 Minn. 179, 188 N. W. 261; State v. Minot, 79 Minn. 118, 81 N. W. 753; 2 Dunnell, Dig. & Supp. § 2448. Experience has shown that in practice many false alibis are asserted. The defense of alibi is viewed with suspicion by those familiar with such matters. In police and prosecuting circles, the defense of alibi is dubiously and suggestively known as the "hip pocket defense," because of the facility with which an alibi can be produced—because one can be fabricated for instant use. The legislature by M. S. A. 630.14 has taken notice of these evils and has provided that in criminal cases the defendant may be required to give advance notice stating certain particulars of the defense of alibi.

2. Where a witness has shown a disposition not to tell the truth, the jury may reject his testimony in favor of a contrary version which appears to be credible. Grengs v. Erickson, 225 Minn. 153, 29 N. W. (2d) 881; State v. Hankins, 193 Minn. 375, 258 N. W. 578, *supra*. Here, both defendant and Mabel testified falsely with respect to the alibis. Furthermore, defendant testified falsely concerning his lack of knowledge of complainant's pregnancy prior to the birth of the child. His own testimony shows that he knew about it when he commented about the fact to complainant when she was hanging out clothes some months before the child was born that she appeared to be pregnant. Consequently, the jury was warranted in disbelieving their testimony concerning the alibi for June 30.

3. As we said in M & M Securities Co. v. Dirnberger, 190 Minn. 57, 62, 250 N. W. 801, 803:

"So the law has come to be that an unexplained failure of a party to produce as a witness a person who knew the facts and who presumably would testify favorably to him justifies an unfavorable jury inference."

That is the settled law here and elsewhere. Shockman v. Union Transfer Co. 220 Minn. 334, 19 N. W. (2d) 812; Waters v. Fiebelkorn, 216 Minn. 489, 13 N. W. (2d) 461; Schultz v. Swift & Co. 210 Minn. 533, 299 N. W. 7; Vorlicky v. Metropolitan L. Ins. Co. 206 Minn. 34, 287 N. W. 109; Fonda v. St. Paul City Ry. Co. 71 Minn. 438, 74 N. W. 166, 70 A. S. R. 341; 2 Dunnell, Dig. & Supp. § 3444; 20 Am. Jur., Evidence, §§ 187, 193. Where a timely request is made for an instruction embodying the rule, it should be granted. Fonda v. St. Paul City Ry. Co. *supra.*

Here, defendant failed to call the doctor whom Melvina claims she visited on the night of June 30, or his assistant, and failed to produce the doctor's office records. Under the rule of Price v. Standard L. & A. Ins. Co. 90 Minn. 264, 95 N. W. 1118, such evidence could have been produced even as against Melvina's objection. There is no reason to believe that she would have objected. On the contrary, because she had become a partisan for defendant, the inference was permissible that she would have consented. The testimony of the doctor or his assistant and his office records would have settled conclusively whether Melvina was at the doctor's office in the evening, as she claimed, or in the afternoon, as complainant claimed. Failure to produce such proofs permitted the jury to infer that if the testimony and records had been produced they would have been unfavorable to defendant. In that view, the jury was warranted in rejecting not only Melvina's testimony that she and George went into town in the evening, when she claims she went to the doctor's office, and not in the afternoon, but also their testimony that they were at home during the afternoon when complainant claims sexual intercourse with defendant occurred, because by their testimony they made the truth of their being at home during the afternoon depend on whether Melvina went to see the doctor in the evening.

Likewise, the same inference might have been drawn because of defendant's failure to recall Ed. Sandberg to the stand to contradict complainant's testimony to the effect that he saw her and defendant together in the restaurant in Renville, and because of his failure to recall Negen to contradict her testimony to the effect that she, de-

fendant, Negen, and Lois Hillstrom were together in defendant's car. On top of all this, a further inference to the same effect was permissible because of defendant's failure to call Lois at all. As Mr. Justice Butler said in Mammoth Oil Co. v. United States, 275 U. S. 13, 51, 48 S. Ct. 1, 9, 72 L. ed. 137, 151, quoting Lord Mansfield in Blatch v. Archer, Cowp. pt. 1, pp. 63, 65, 98 Reprint, 968, "all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted." So, it was here.

4. Furthermore, defendant's failure to take the stand and contradict complainant with respect to the matters referred to in the preceding paragraph went directly to his own credibility. State v. Spaulding, 34 Minn. 361, 25 N. W. 793.

5. Where testimony is inherently improbable, the jury may disregard it. Maas v. Midway Chevrolet Co. 219 Minn. 461, 18 N. W. (2d) 233, 158 A. L. R. 215; Osbon v. Hartfiel, 201 Minn. 347, 276 N. W. 270. Ranco Negen's testimony concerning his remarkable feats of memory was inherently improbable and might properly have been rejected under the rule. The rule has been laid down in 32 C. J. S., Evidence, § 1029: "Courts have little or no faith in a witness' recollection of dates or the time of day of events if he does not reckon or fix them by means of reliable associated facts or events." The jury here was not required to attach any weight to his testimony and was justified in rejecting it altogether.

Other evidence might have been rejected under this rule. The testimony of Mabel and Melvina as to their insulation of defendant from complainant was not only improbable, but was shown to be untrue. Defendant himself testified that he talked to complainant and told her that she appeared to be pregnant, and further that he took her to Renville and return in November. All this occurred without Mabel's and Melvina's knowledge. How much more occurred without their knowledge was for the jury to say.

Likewise, the claim that there was no intimacy of any sort between complainant and defendant was shaken by the incident of defendant's remark to complainant that she appeared to be pregnant. This

occurred casually, according to his version. The fact is that ordinarily men do not mention to women matters concerning sex, pregnancy, and the like. A sense of delicacy and propriety forbids. Such discussion is open only to those who are on terms of intimacy. Here, the jury might well have believed that such intimacy consisted of the sexual one claimed by complainant and denied by defendant.

Likewise, the claim of George and Melvina that George took their six-year-old and three-year-old children to a night performance of the circus while Melvina sat in their car might well have taxed the jury's credulity. The jury might have believed that George as a doting father would take his six-year-old son to a night performance of the circus, but it must have been well-nigh impossible to believe that he would take his three-year-old daughter, who would be sure to fall asleep and who then could have been put in an improvised bed in the car to sleep under her mother's watchful care. The taint of inherent improbability added to other infirmities so weakened their testimony as to justify the jury in rejecting it entirely.

6. Where, as here, the evidence is conflicting, the jury might consider as affecting the weight and credibility of a witness's testimony his interest or bias, or the lack thereof, blood relationship, friendship, partisanship, hostility to the adverse party, and the like. Weinstein v. Schwartz, 204 Minn. 189, 283 N. W. 127; Davis v. Commonwealth, 270 Ky. 53, 109 S. W. (2d) 2; Oldham v. Commonwealth, 228 Ky. 307, 14 S. W. (2d) 1065; State v. Branch, 193 N. C. 621, 137 S. E. 801. The defense witnesses were relatives and friends of defendant, partisans for his acquittal, and hostile to complainant. These matters were reflected in the claims of extreme watchfulness exercised by Mabel and Melvina over defendant and complainant, defendant's unqualified denials, which he subsequently qualified, Ranco's unprecedented recollection of dates and events and the manner in which the witness testified, and Johnson's forthright testimony to such effect. A jury is under no duty of believing the testimony of such witnesses.

7. Lastly, the demeanor and testimony of defendant and his witnesses must have disclosed that they were a discredited lot. Demeanor evidence may be of great weight in determining who is telling the truth. S. Buchsbaum & Co. v. Federal Trade Comm. (7 Cir.) 153 F. (2d) 85.

A careful examination of the record leaves one with the conviction that complainant's version of the facts withstood the assaults made upon it by the defense. The jury witnessed a complete denouement and collapse of what was supposed to be a watertight defense— the alibis were proved to be false; the proof of lack of opportunity for defendant and complainant to have sexual intercourse was shown to be so untrustworthy as to be incredible; and the contradictions completely failed. At the finish, the defense lacked the vitality to deny complainant's testimony that she not only had been out with defendant, the denial of which was asserted as an important feature of the defense, but also that she had been out with him, his relatives, and his friends. That was a challenge for the defense to meet, but one which it declined. Under the circumstances, what was the jury to infer? Was it that defendant himself could not take the stand again without the risk of making further damaging admissions such as the one concerning his knowledge of complainant's pregnancy, which showed that he had testified falsely when he testified to a lack thereof, and those concerning the trip to Renville with complainant and the conversation with her in the yard, which showed that Mabel's and Melvina's claims that they had insulated defendant from complainant were false? Was it that Ed. Sandberg's testimony had already scrambled the alibis and that further testimony by him might do only further harm? Was it that, like the rotten apple in the barrel spreading its taint, Negen by his untruthfulness had created belief that the whole defense was tainted with it and that recalling him might not only accentuate that fact, but also, because he had been thoroughly discredited, that his testimony might be entirely useless? Was it that Lois would not give false testimony to repair an already broken defense? Johnson's testimony showed that he had nothing substantive to contribute by

way of further testimony. The jury might well have concluded that the defense itself realized that its claims had been exposed as false; that its witnesses had been discredited; and that it had failed utterly. It might well have concluded that the complainant's version was true and that it had withstood all the assaults made upon it. That being true, the conviction should stand.

THOMAS GALLAGHER, JUSTICE (dissenting).
I concur in the decision of Mr. Justice Peterson.

MR. JUSTICE KNUTSON, not having been a member of the court at the time of the argument, took no part in the consideration or decision of this case.